THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, Plaintiff-Appellant, v. DEBORAH HARRIS et al., Defendants-Appellees.

First District (3rd Division)   No. 1—89—2361

Opinion filed September 4, 1991.

Board of Education of City of Chicago, of Chicago (Patricia J. Witten and Camille E. Willis, of counsel), for appellant.

Witwer, Burlage, Poltrock & Giampietro, of Chicago (Wayne B. Giampietro and Sharon M. Goss, of counsel), for appellees.

JUSTICE WHITE* delivered the opinion of the court:

A hearing officer appointed by the State Board of Education (the State Board) directed that defendant Deborah Harris be reinstated as a schoolteacher. Plaintiff, the Board of Education of the City of Chicago (the board), sought administrative review in the circuit court of Cook County, naming the State Board and Marvin Hill, Jr. (the hearing offi-

---

*This opinion was authored prior to Justice White's retirement.

cer), as additional defendants. The circuit court affirmed the hearing officer's decision.

On appeal, neither party formally contests the hearing officer's finding that Harris' conduct was insubordinate and unbecoming a teacher. Rather, the parties frame three issues, involving the adequacy of Harris' predismissal warnings, the nature of the proceedings before the hearing officer, and the question of irremediability. We need not address the first two issues at length, for we reverse on the third, holding that Harris' conduct was irremediable.

## I. PROCEDURAL HISTORY

The board suspended Harris from her employment and instituted dismissal proceedings against her, charging both insubordination and conduct unbecoming a teacher. The hearing officer found that Harris had been insubordinate but that the board had not demonstrated that her conduct had been irremediable. The hearing officer thus decided that she should not be dismissed and directed the board to reinstate her.

The circuit court affirmed the hearing officer's findings but remanded the cause for additional findings on (1) whether Harris had engaged in conduct unbecoming a schoolteacher; (2) if so, whether such conduct had been irremediable; and (3) whether Harris' actions in relation to all charges against her had constituted irremediable conduct.

After remand, the hearing officer found that Harris had engaged in unbecoming conduct but that her actions had not constituted irremediable conduct either separately or in combination.

The board then filed a supplemental complaint for administrative review, but the court affirmed the hearing officer's decision after remand. This appeal ensued.

## II. FACTS

The administrative hearing record, including the hearing officer's findings, reveals the following salient facts.

Harris had been employed by the board as a teacher since 1971 and for the first 12 years received "superior" or "excellent" ratings. During the 1983-84 school year, while she was teaching at Thomas Brenan Elementary School, her school was assigned a new principal, and Harris then received an "unsatisfactory" rating. The rating was rescinded after she filed a grievance, and she subsequently filed a discrimination charge and then a retaliation charge with the Illinois Department of Human Rights.

Prior to the beginning of the 1985-86 school year, she was administratively transferred to John D. Shoop Elementary School. However, when she reported there, no position was available for which she held a teacher's certificate, and she performed miscellaneous duties. According to her principal's testimony, he soon found it possible to assign her to a third-grade classroom for which she was certified, but she told him that she had a special status calling for her to be assigned only to the fifth grade and that she would supply him with pertinent documentation. The principal testified that he never received such documentation.

On or about September 16, 1985, the principal assigned her to an eighth-grade classroom to replace a teacher who had gone on medical leave. At first she refused the assignment but accepted it under protest the next day. When the original teacher returned from leave, that teacher was assigned to a reading laboratory, and Harris continued to teach the eighth-grade class.

Harris complained of depression and back problems as a result of stress from the eighth-grade classroom, which was disorganized and contained several students with disciplinary and emotional problems. A physician prescribed medication but eventually concluded that her condition precluded further teaching duties, and she obtained a medical leave of absence. Meanwhile, a fact-finding conference on her human rights charges was conducted.

In the summer of 1986, Harris' physician concluded that she could return to employment but not to classroom duties. According to Harris, she sent a copy of his letter to the attorney who was then representing her and asked him to forward it to the board. She testified that later the attorney told her that he had done so.

In August 1986, Harris asked the board for reinstatement to her teaching position and was told to report to Shoop School.

On September 2, 1986, Harris reported to Shoop School and was assigned to a seventh-grade class. According to Harris, she told her principal that her physician had sent a letter to the board saying that she could not perform classroom duties. She testified that, later on the same day, she told the district superintendent the same thing. The principal and district superintendent denied that Harris had so informed them, and the hearing officer found that she had not done so. Eventually, though, in mid-October 1986, Harris sent each of them a copy of her physician's letter.

The principal and district superintendent testified that Harris had refused to accept her 1986 assignment. However, the principal acknowledged that Harris had suggested that he telephone the board's

attorneys regarding her failure to accept her assignment but that he never did so.

Harris continued to report to Shoop School until about October 22 and usually remained in the office of the school's community representative. According to her testimony, she performed miscellaneous tasks there, even though she received no pay for any day after the first.

The principal told Harris by letters on September 2 and 18 that she was assigned to the seventh grade and that refusal to accept the assignment might subject her to charges of irremediable conduct unbecoming a teacher. However, the board itself never served Harris with a notice to remedy the failure to accept her assignment.

The principal also handed Harris a memorandum at the end of each day on which she reported. Each memorandum told her that she had failed to teach her assigned classroom and that the school had been required to engage a substitute teacher. After September 2, 1986, the district superintendent made no effort to talk with Harris and ascertain why she was refusing to accept her assignment, though he talked with her principal about her every one or two days.

The director of the board's bureau of teacher personnel provided Harris with a presuspension hearing on November 13, 1986. Following the hearing, at which Harris appeared with counsel, the director recommended that a proposed recommendation for Harris' suspension and dismissal be presented to the board as soon as possible. Then, on November 19, 1986, the board adopted charges against Harris, thereby initiating formal dismissal proceedings. Her suspension from employment began on November 21, 1986, when she received notice of the board's action.

III. ANALYSIS

A. LAW OF DISMISSAL AND REMEDIABILITY

■ Under section 34—85 of the School Code (Code) (Ill. Rev. Stat. 1985, ch. 122, par. 34—85), no permanently appointed teacher in the Chicago public school system is to be removed except for cause. The local board must first approve a motion containing written charges presented by the general superintendent of schools, and written notice of the approved charges is to be served on the teacher. If requested by the teacher, a hearing is then to be held before a disinterested hearing officer paid by the State Board of Education and selected by the parties from a list furnished by the State Board. Pend-

ing the hearing, the teacher may be suspended pursuant to local board rules but, if acquitted, is to suffer no pay loss.

■ At the dismissal hearing, the teacher may appear with counsel, cross-examine witnesses, and present evidence and defenses. Afterward, the hearing officer is to make a final decision on whether the teacher is to be dismissed. Under section 34—85b of the Code (Ill. Rev. Stat. 1985, ch. 122, par. 34—85b), the hearing officer's decision is subject to the Administrative Review Law (Ill. Rev. Stat. 1985, ch. 110, par. 3—101 *et seq.*).

■ If the causes for dismissal may be deemed remediable, the local board is not to serve notice of charges unless the teacher has first been given reasonable written warning, specifying the causes that, if not removed, might result in charges. (Ill. Rev. Stat. 1985, ch. 122, par. 34—85; *Board of Education v. State Board of Education* (1987), 160 Ill. App. 3d 769, 773, 513 N.E.2d 845, 847 (*Parkman*).) However, as stated in section 24A—5 of the Code, the warning requirement does not apply if the teacher's deficiencies are deemed irremediable. (Ill. Rev. Stat. 1985, ch. 122, par. 24A—5; *Parkman*, 160 Ill. App. 3d at 773, 513 N.E.2d at 847.) The warning requirement is also inapplicable (Ill. Rev. Stat. 1985, ch. 122, par. 34—85) if the causes for dismissal have been the subject of a remediation plan developed under article 24A of the Code (Ill. Rev. Stat. 1985, ch. 122, par. 24A—1 *et seq.*); however, no plan had been developed for Harris.

■ The statutory written warning, when required, must be sent by or at the direction of the local board and must state causes that may result in charges leading to dismissal; a written warning from a principal without prior local board approval is insufficient. (*Litin v. Board of Education* (1979), 72 Ill. App. 3d 889, 893, 391 N.E.2d 62, 64-65; *cf. Stratton v. Wenona Community Unit District No. 1* (1990), 133 Ill. 2d 413, 551 N.E.2d 640.) If insufficient written warning is given to a tenured teacher prior to dismissal proceedings, the local board has the burden of proving not only that causes for dismissal existed but also that those causes were irremediable. (*Parkman*, 160 Ill. App. 3d at 773, 513 N.E.2d at 847; *Morris v. Board of Education* (1981), 96 Ill. App. 3d 405, 411-12, 421 N.E.2d 387, 392.) If the local board fails to prove irremediability in such a case, it is deprived of jurisdiction to seek dismissal of the teacher. *Parkman*, 160 Ill. App. 3d at 773, 513 N.E.2d at 847; *Chicago Board of Education v. Payne* (1981), 102 Ill. App. 3d 741, 749, 430 N.E.2d 310, 316.

■■ A teacher's conduct is irremediable if it (1) has caused significant damage to students, the faculty, or the school and (2) could not have been corrected even if superiors had given the teacher the

statutorily prescribed warning. (*Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622* (1977), 67 Ill. 2d 143, 153, 365 N.E.2d 322, 326; *Parkman*, 160 Ill. App. 3d at 776, 513 N.E.2d at 849; see *Board of Education of School District No. 131 v. State Board of Education* (1983), 99 Ill. 2d 111, 119-21, 457 N.E.2d 435, 439-40 (*Slavin*).) However, subsequent cases have seen at least two refinements of the *Gilliland*-derived irremediability test. First, it has been held that individual acts, separately remediable, may be irremediable when considered in totality; they must have long continued, and a court may consider whether the cause for dismissal is itself irremediable and whether the teacher demonstrated willingness to correct the conduct. (*Parkman*, 160 Ill. App. 3d at 779, 513 N.E.2d at 851.) Second, criminal conduct has been held to be irremediable *per se* regardless of the test. *E.g., McBroom v. Board of Education of District No. 205* (1986), 144 Ill. App. 3d 463, 474, 494 N.E.2d 1191, 1198. See generally Thurston, *Dismissal of Tenured Teachers in Illinois: Evolution of a Viable System*, 1990 U. Ill. L. Rev. 1.

In the present cause, if Harris' conduct had been remediable, the principal's own written warnings and daily memoranda could not have constituted a statutorily required predismissal warning, because they were not the product of a decision by the board. Thus, to support Harris' statutorily unwarned dismissal, the irremediability of her conduct was one of the facts that the board had to prove.

At oral argument before us, the board's counsel rightly receded from a position taken in briefs, instead agreeing that the hearing officer, not the board, was the fact finder on remediability and that his findings, not the board's, are what merit deference on administrative review. Indeed, this court has rejected contentions similar to those from which the board now recedes here. See *Board of Education, School District No. 151 v. Illinois State Board of Education* (1987), 154 Ill. App. 3d 375, 381, 507 N.E.2d 134, 138-39 (*Weathers*); *Board of Education, Niles Township High School District No. 219 v. Epstein* (1979), 72 Ill. App. 3d 723, 726, 391 N.E.2d 114, 116.

It is true that some cases have appeared to state a rule of appellate deference to a local board's (rather than a hearing officer's) decision on remediability. *E.g., Gilliland*, 67 Ill. 2d at 153, 365 N.E.2d at 326; *Hegener v. Board of Education* (1991), 208 Ill. App. 3d 701, 732, 567 N.E.2d 566, 586; *Board of Education v. Box* (1989), 191 Ill. App. 3d 31, 39, 547 N.E.2d 627, 632; *deOliveira v. State Board of Education* (1987), 158 Ill. App. 3d 111, 121, 511 N.E.2d 172, 179; *Fadler v. State Board of Education* (1987), 153 Ill. App. 3d 1024, 1027, 506 N.E.2d 640, 643; *McBroom v. Board of Education of District No. 205*

(1986), 144 Ill. App. 3d 463, 473, 494 N.E.2d 1191, 1198; *Stamper v. Board of Education of Elementary School District No. 143* (1986), 141 Ill. App. 3d 884, 887, 491 N.E.2d 36, 38; *Szabo v. Board of Education of Community Consolidated School District 54* (1983), 117 Ill. App. 3d 869, 872-73, 454 N.E.2d 39, 42; *Chicago Board of Education v. Payne* (1981), 102 Ill. App. 3d 741, 749, 430 N.E.2d 310, 316; *Morris v. Board of Education* (1981), 96 Ill. App. 3d 405, 411, 421 N.E.2d 387, 392; *Lowe v. Board of Education* (1979), 76 Ill. App. 3d 348, 355, 395 N.E.2d 59, 63; *Yuen v. Board of Education of School District No. 46* (1966), 77 Ill. App. 2d 353, 358, 222 N.E.2d 570, 572.

However, each of those cases either involved a dismissal that predated the present statutory system of impartial hearing officers (*Gilliland*, 67 Ill. 2d 143, 365 N.E.2d 322; *Morris*, 96 Ill. App. 3d 405, 421 N.E.2d 387; *Lowe*, 76 Ill. App. 3d 348, 395 N.E.2d 59; *Yuen*, 77 Ill. App. 3d 353, 222 N.E.2d 570) or, without discussion or reliance, merely cited outmoded precedent stemming from such a dismissal (*e.g.*, *Hegener*, 208 Ill. App. 3d 701, 567 N.E.2d 566; *Box*, 191 Ill. App. 3d 31, 547 N.E.2d 627; *Szabo*, 117 Ill. App. 3d 869, 454 N.E.2d 39). Meanwhile, in *Board of Education of School District No. 131 v. Illinois State Board of Education* (1980), 82 Ill. App. 3d 820, 823-24, 403 N.E.2d 277, 279-80 (*Murray*), the distinction between present and former dismissal procedures, and the resulting shift of appellate deference from the local board to the hearing officer, was clearly pointed out. (See also Pub. Act 79—561, §1, eff. Aug. 26, 1975 (amending Ill. Rev. Stat. 1973, ch. 122, par. 24—12) (governing dismissals in districts outside Chicago); Pub. Act 80—1308, §1, eff. Aug. 7, 1978 (amending Ill. Rev. Stat. 1977, ch. 122, par. 34—85) (governing dismissals in Chicago district).) Moreover, even in those modern cases that cited the old rule of deference to the local board, actual deference to a local board's own determination of irremediability typically was *not* shown. Rather, hearing officers heard local boards' evidence on irremediability *de novo*, and the appellate court discussed the evidence in the same light. See *Hegener*, 208 Ill. App. 3d 701, 567 N.E.2d 566; *Box*, 191 Ill. App. 3d 31, 547 N.E.2d 627; *Fadler*, 153 Ill. App. 3d 1024, 506 N.E.2d 640; *McBroom*, 144 Ill. App. 3d 463, 494 N.E.2d 1191; *Szabo*, 117 Ill. App. 3d 869, 454 N.E.2d 39; *Payne*, 102 Ill. App. 3d 741, 430 N.E.2d 310.

■ Having now reaffirmed that dismissal hearings before hearing officers are *de novo* proceedings, at which preponderance of the evidence is the standard of proof on factual issues (see *Board of Education v. State Board of Education* (1986), 113 Ill. 2d 173, 189, 497

N.E.2d 984, 990 (*Kimbrough*)), we turn to the central issue of this cause: whether Harris' conduct was remediable.

## B. IRREMEDIABILITY OF HARRIS' CONDUCT

We must decide whether the hearing officer's finding of remediability, though normally entitled to deference, was contrary to the manifest weight of the evidence or was erroneous as a matter of law.

The board contends that Harris' conduct should not be judged by the two-part *Gilliland* remediability standard (*i.e.,* insignificant damage and potential corrigibility) but should be regarded as irremediable *per se* in the same way as criminal conduct has been regarded. (See *McBroom*, 144 Ill. App. 3d at 473-74, 494 N.E.2d at 1198.) Acknowledging that Harris' conduct was not criminal, the board argues nevertheless that, like the theft from a student's locker that was classified as irremediable *per se* in *McBroom*, Harris' insubordination was unconnected with teaching deficiencies or corporal punishment, it reflected an abnormal employee behavior norm, and it had "no legitimate basis in our society" (*McBroom*, 144 Ill. App. 3d at 474, 494 N.E.2d at 1198). The board also argues that Harris was intended to be a role model and that flaunting her insubordination subverted that function, just as criminal conduct was seen to do in *McBroom*.

In reply, Harris denies that she was shown to have flaunted any insubordination, asserting that in any event the *McBroom* analogy is strained. She contends that simply reporting to school, signing in, and working in the school community representative's office constituted neither flaunting nor conduct unbecoming a teacher, even if other teachers saw her. In addition, Harris contends that cases amounting to adjudications of irremediability *per se* have been limited to criminal conduct. *McBroom*, 144 Ill. App. 3d 463, 494 N.E.2d 1191 (theft); *Chicago Board of Education v. Payne* (1981), 102 Ill. App. 3d 741, 430 N.E.2d 310 (illegal drug possession); *cf. Board of Education of Argo-Summit School District No. 104 v. State Board of Education* (1985), 138 Ill. App. 3d 947, 487 N.E.2d 24 (*Hunt*) ("immoral" conduct of pinching young girls' buttocks).

Alternatively, if the two-part *Gilliland* test for irremediability does apply, the board argues that, despite the hearing officer's finding of no damage, Harris' conduct must have damaged the students. The board reasons that this was because of Harris' role-model status and because the proficiency of the students' substitute teacher must have been impaired by anxiety over potential job displacement if Harris were to return to the classroom. The board contends that, because the amount of such damage is immeasurable, the mere fact that some

damage occurred should be enough to satisfy the first part of the *Gilliland* test.

The board also argues that, even though the hearing officer found Harris' conduct to be less serious than in certain reported cases of irremediability, Harris' conduct in fact was more serious. The board contends that Harris' permanent refusal to accept her classroom assignment was more serious than the unauthorized temporary absences in three irremediability cases, while being just as intentional and willful as the conduct in those cases. (*Christopherson v. Spring Valley Elementary School District* (1980), 90 Ill. App. 3d 460, 413 N.E.2d 199; *Pittel v. Board of Education of School District 111* (1974), 20 Ill. App. 3d 580, 315 N.E.2d 179; *Yuen v. Board of Education of School District No. 46* (1966), 77 Ill. App. 2d 353, 222 N.E.2d 570.) In addition, the board argues that Harris had engaged in similar conduct a year earlier, that she had been warned not to repeat it, and that certain other cases of remediability on which the hearing officer relied were not factually comparable.

The board contends that, although the hearing officer found no damage, he failed to make a finding as to whether Harris' conduct could have been corrected if she had been given a statutory warning. The board continues that, as demonstrated by her persistent three-month refusal to take her assignment, Harris' conduct clearly could not have been corrected by a statutory warning.

Finally, the board argues that the hearing officer failed to consider evidence of other damage to the school system, such as the need to procure and supervise temporary substitute teachers, to draft numerous letters and memoranda, and to communicate with Harris' eventual assigned substitute; the psychological stress on Harris' principal and colleagues; and the public knowledge that a board employee had refused to perform her duties.

Harris replies that the school's classroom schedule had not been disrupted and that, in fact, because the principal did not expect Harris to return to teaching at the beginning of the 1986-87 school term, the principal already had a full complement of teachers on hand at that time. Harris also argues that the evidence as to what occurred in conferences between her and school authorities was conflicting but that the principal admittedly was asked by her to call the board about her status and failed to do so. She also argues that by October the principal and district superintendent were admittedly given a copy of her doctor's letter but failed to request a medical examination, discuss her situation further with her, check official board records of her sta-

tus, issue a formal warning letter, or do anything else to resolve her situation except refer her case to the board's law department.

Harris also argues that her conduct contrasts with the irremediable conduct of teachers in *Christopherson* and *Yuen*. She asserts that she never announced her intention to defy a board ruling, her doctor's advice constituted a reasonable justification for her insubordination, her conduct had not harmed the board, and there is nothing in the record to show that she would not have corrected her behavior if she had been formally warned. Harris also compares her case to others in which conduct was found to have been remediable.

Harris contends that, in order to support a claim of irremediability and thus rid itself of an employee whose human rights complaint was pending, the board allowed her case to languish for months without ever issuing a statutory warning (despite her principal's request for one) or otherwise bringing the case to a head. Harris argues that a board is not permitted to withhold a statutory warning in order that once-remediable conduct might continue for long enough to justify a determination that, by the passage of time, it had become irremediable. *Hegener*, 208 Ill. App. 3d at 738, 567 N.E.2d at 590; *Paprocki v. Board of Education of McHenry Community High School District No. 156* (1975), 31 Ill. App. 3d 112, 114, 334 N.E.2d 841, 844.

The board denies that it purposely allowed Harris' conduct to continue unwarned in order to support an eventual finding of irremediability. The board reasons that, because Harris had relented and accepted an assignment in 1985 after one day of refusal, the board was entitled to assume that she would behave similarly in 1986. The board asserts that, by the time it became clear that she would not relent in 1986, her conduct had become irremediable through no fault of the board's.

To decide this cause, we need not consider the board's invitation to expand a concept of *per se* irremediability. Instead, we agree with the board's alternative argument: that Harris' conduct was irremediable as judged by the normal two-part *Gilliland* test. We believe that the hearing officer's decision to the contrary was based on an incorrect view of the law.

■ The first part of the *Gilliland* test for irremediability requires that the teacher's conduct have caused damage to students, faculty, or school. Here, the hearing officer found "little, if any, detrimental effect on the students" from Harris' refusal to accept her assignment. The hearing officer reasoned that the students were "better off" with their capable substitute teacher than they would have been with "a recalcitrant Mrs. Harris." By definition, however, if Harris had taught

her class, she would not be "recalcitrant." Harris was not found to be any less competent than the substitute teacher; Harris merely was unwilling to teach as assigned.

We feel that the hearing officer put the cart before the horse: Harris was not recalcitrant because a substitute teacher was found; rather, school administrators had to find the substitute because Harris was recalcitrant. Any question of comparing Harris' recalcitrance to a substitute's competence would never have arisen had Harris performed her duty. By the hearing officer's logic, no matter how severe the damage that a teacher's conduct threatened, school officials whose efforts succeeded in minimizing or averting the damage would also have automatically immunized the conduct from unwarned dismissal proceedings. Besides, whether or not Harris' conduct damaged the students, it damaged the faculty and the school—which the hearing officer acknowledged. That damage to faculty morale, parental relations, and orderly school administration certainly satisfied the *Gilliland* test's first part.

The second part of the *Gilliland* test requires that the conduct have been incapable of correction even if the teacher had been warned. It is true that a board cannot lawfully evade its predismissal warning duty by purposely allowing a teacher's conduct to persist long enough to be classified as irremediable and thus exempt from the warning requirement. The hearing officer was mystified as to why, despite the principal's request to do so, the board never gave Harris an official written warning. However, Harris did not actually show that the board's failure to warn was a subterfuge to expedite dismissal. Neither did she show that she would have altered her conduct if officially warned by the board in writing. On the contrary, she persisted despite many oral and written warnings by the principal and the district superintendent—warnings that referred to the possibility of losing her position if she did not comply.

While the lack of a written board warning may be decisive of whether the board must prove irremediability, it need not be decisive of the irremediability question itself. We think that the history of this cause amply shows that, even had Harris received an official written warning from the board rather than the warnings she did receive, she would have continued her insubordinate and unbecoming conduct.

According to the board's evidence, Harris insisted that she would not accept a classroom assignment, demanded that the principal call the board's attorney to learn why, and, six weeks into the school year, finally advised the principal and district superintendent of a medical problem. She maintained her refusal throughout meetings with dis-

trict personnel as well as with the principal. According to Harris, she repeatedly spoke of a medical problem, beginning with her first 1986 contact with the principal. However, Harris acknowledged that she never communicated with the board's administrative offices about her claim of a medical problem, and that she simply reported to the school's community representative's office each day despite the principal's instructions to report to a classroom. The hearing officer specifically found that Harris did not inform the principal of a medical problem as early as she said she did. The hearing officer also found that Harris had a duty to make school authorities aware of any medical problem she claimed and that it was insufficient for her simply to demand that they call the board's attorney: "If there was any misunderstanding it was created by Mrs. Harris who, from day one, made it clear that she was not interested in teaching."

In order to avoid any appearance of leading Harris down the path of irremediability by passage of time, it would have been better if the board itself had promptly given her an official written predismissal warning. However, the warnings she did receive included references to possible dismissal. From her reaction to those warnings, we think it is clear that she would have behaved the same way even if they had come on a different letterhead. Thus, while the board's failure to give a written warning in the board's name required it to prove irremediability, the nonboard warnings that Harris received and defied are persuasive evidence of irremediability.

This is not a case in which a teacher went without any warnings at all until suddenly irremediability was alleged to have resulted from the passage of time. (*Cf. Hegener*, 208 Ill. App. 3d at 739, 567 N.E.2d at 591 ("cases which deal with the principle of once remediable conduct becoming irremediable *** require some continuing warning that the conduct *** was inappropriate").) Rather, this is a case of patent irremediability resulting from Harris' obstinate defiance of the repeated warnings that school officials gave her, as well as from the passage of time. Irremediability having thus been clearly shown, no formal written warning in the board's own name was required in order to dismiss Harris. The hearing officer and circuit court erred in concluding otherwise.

Accordingly, the judgment of the circuit court and the decision of the hearing officer are reversed and remanded.

Reversed and remanded.

CERDA, P.J., and RIZZI, J., concur.