SIXTH DIVISION

April 4, 2003

Nos. 1-01-3525 and 1-01-4415 (consolidated)

WYNONA YOUNGE,

Plaintiff-Appellant,

v.

THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, PAUL VALLAS, Chief Executive Officer, JAMES A. RAPP, Hearing Officer, and ILLINOIS STATE BOARD OF EDUCATION,

Defendants-Appellees.

))))))))))))

Appeal from the

Circuit Court of

Cook County

Honorable

Stephen A. Schiller

Judge Presiding.

LOUELLA HIGGS,

Plaintiff-Appellant,

v.

THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, PAUL G. VALLAS, Chief Executive Officer, EDWARD L. SUNTRUP, Hearing Officer, and ILLINOIS STATE BOARD OF EDUCATION,

Defendants-Appellees.

))))))))))))

Appeal from the

Circuit Court of

Cook County

Honorable

Julia M. Nowicki

Judge Presiding.

JUSTICE GALLAGHER delivered the opinion of the court:

This is a consolidated appeal from two orders of the circuit court of Cook County, each of which affirmed a decision by defendant, the Board of Education of the City of Chicago (Board), to discharge a tenured public school teacher for reporting to work under the influence of marijuana.  We affirm.

BACKGROUND

We shall separately discuss the factual background of each plaintiff's case.  The record reveals the following relevant facts.  

Plaintiff Wynona Younge

Wynona Younge was a tenured teacher who had been employed since 1970.  From 1982, she had been assigned to Ruggles Elementary School.

In early October 1997, interim principal Pamela Strain became concerned with Younge's recent behavior.  Strain asked her secretary and one of the assistant principals to prepare a log by compiling notes and correspondence that Strain had received about Younge between October 1, 1997, through October 22, 1997.

An entry on October 2, 1997, noted that Younge's sixth- and seventh-grade students complained to assistant principal Myrna Dill-London (Dill) that they were not being allowed to use the washroom.  Strain also received calls from parents who made similar complaints on behalf of their children.

Parents also complained that Younge was screaming at their children.  The parents threatened to report Strain to the Board's regional office if she did not take action.  The parents of one student, who had always been a good student in past years, phoned and met in person with Strain about their child's reluctance to come to school.  Although Strain asked the parents to wait a few days to see if the problem could be resolved, the parents insisted on transferring the student from Younge's classroom.  Strain granted their request.

On October 17, 1997, a student complained that Younge had called her fat or stupid.  Based on these complaints, as well as the fact that Younge had been wearing sunglasses indoors and because her eye pupils were dilated, Strain and Dill had some conferences with Younge.

On October 22, 1997, staff members, who notably were Younge's friends for many years and did not want any harm to come to her, informed Strain that Younge had left her classroom unattended on several occasions.  They wanted the confusion to stop and the children to be safe.

On the same day, as a result of these matters,  Strain contacted Michelle Quigley, R.N., the medical administrator of the Chicago Public Schools, and requested that Younge have a drug screening test.  School policy required that, in order to determine whether reasonable suspicion existed for testing, the assistant principal must concur in the need.  Because Dill was uncertain regarding Younge's physical appearance, Quigley declined the request.

Around the same time, the Board's office of investigations looked into a report that Younge had pushed one student and verbally abused other students.  A 12-year-old student told investigators that when she tried to enter the classroom, Younge elbowed her in the stomach and pushed her back into the hallway.  This report was confirmed by two other students.  Another student said Younge told him he was a failure and to shut up. Younge also told another student that she was surprised the student got out of kindergarten.

On October 23, 1997, Strain told the investigator that Younge was having problems, which she believed placed students in her class at risk of harm.  The investigator concluded, however, that Younge's actions and speech did not rise to the level of a violation of Board policy.

On October 24, 1997, Strain observed Younge and noticed that Younge's eyes were red, her face was swollen, and she appeared to lack coordination.  Strain asked Dill to go to Younge's class and personally observe Younge's appearance and behavior.  After observing Younge, Dill concurred with Strain's observations regarding the red eyes and swollen face.  Strain and Dill agreed that Younge should be referred for testing.  They signed a form requesting drug testing based upon reasonable suspicion.  This time, Quigley decided that the circumstances warranted the drug screening and dispatched security personnel to escort Younge to Mercy Works Occupational Medical Center (Mercy Works) for testing.

Younge went to Mercy Works and cooperated in the testing.  She provided a urine sample which was then sent to a facility called MedTox Laboratories in St. Paul, Minnesota (MedTox).  Results of the analysis showed positive for tetrahydrocannabinol (THC), a marijuana metabolite.  The concentration in Younge's sample was 39 nanograms per millileter.  According to the MedTox agreement with Mercy Works, any concentration over 15 nanograms per millileter is a positive result.

After the drug testing was completed, Younge's blood pressure was discovered to be uncontrollably high.  She was transported by ambulance to a hospital where she remained until November 17, 1997.  Younge subsequently applied for and received a medical leave of absence.  As a result, the Board took no action to advance Younge's dismissal.  After Younge indicated that she planned to return, however, charges were brought against her seeking her dismissal.

On August 14, 1998, Younge was charged by Chicago Public Schools' chief executive officer, Paul Vallas, with the following: (1) violating section 3-12 of the Chicago Public Schools Employee Discipline Code (Employee Discipline Code), which prohibits employees from reporting to work under the influence of alcohol or illegal drugs; (2) violating section 4-8 of the Employee Discipline Code, which prohibits conduct that is criminal, immoral, cruel or negligent or causes psychological or physical harm or injury to a student; (3) violating Board Rule 4-50(b), which relates to the Board's comprehensive policy of maintaining a drug and alcohol free workplace and the Chicago Public Schools drug and alcohol testing policy; and (4) conduct unbecoming a teacher in the Chicago Public Schools.

A hearing was held before hearing officer James A. Rapp.  At the hearing, Younge initiated a number of theories to discredit the test results, including criticisms of the testing procedures, possible use or contamination with marijuana of Chinese herbal medicines she was taking, and use of over-the-counter medications.  All of these theories were rejected by the hearing officer, who found that Younge was under the influence of marijuana when she reported to work on October 24, 1997.  In addition to this finding, the hearing officer found that, by virtue of being under the influence of marijuana, by implication Younge had used marijuana and that use of marijuana is criminal conduct.  Rapp further found that Younge violated sections 3-12 and 4-8 of the Employee Discipline Code, Board Rule 4-50(b) and the Chicago Public Schools drug and alcohol testing policy, and that being under the influence of and the use of marijuana constituted conduct unbecoming an employee.  Finally, he concluded that Younge's conduct was irremediable, a written warning was not required and the circumstances supported the dismissal of Younge.  On May 24, 2000, the Board adopted the recommendation that Younge be dismissed.

On May 27, 2000, Younge filed a complaint for administrative review with the circuit court of Cook County.  On August 22, 2001, Circuit Court Judge Stephen A. Schiller issued an order denying Younge's petition for administrative review and affirmed the Board's decision to dismiss Younge.  On September 21, 2001, Younge filed a timely notice of appeal.

Plaintiff Louella Higgs

Higgs was a tenured teacher employed by the Board.  Her appointment was at Hayt School, which is an elementary school.  Higgs was a physical education teacher.

On the morning of September 14, 1998, Higgs arrived at work.  Assistant principal Bernard Murray first saw Higgs between 8:30 and 8:45 a.m. and she looked like her ususal self.  Higgs' first class, with 30 to 33 children, was scheduled to begin at 9:20 a.m.

At approximately nine or ten o'clock that morning, Murray passed by Higgs, who was standing at the main entrance to the school.  Higgs was the only person standing in the entrance area.  When Murray noticed a very strong odor of marijuana, he engaged Higgs in a brief conversation.  Due to the strength of the odor, Murray concluded that it was coming from Higgs.  Murray, who had been the assistant principal at Hayt School for three years and who had known Higgs for almost two years, observed that Higgs' eyes were hazy and glazed over and were not as clear or focused as they were normally.  Believing Higgs to be under the influence of marijuana, Murray went directly to the principal's office to report what he had observed.  He filled out a form, noting that Higgs' pupils were dilated, she had unusual eye movement, and she smelled of marijuana.

Murray began conducting a teacher training session that afternoon.  He noticed that Higgs was resting on both elbows and sitting in a manner he described as “kind of slouched, kind of leaned over on the table just kind of like in a relaxed state.” 

Melody Williamson, who had been the principal of Hayt School for six years and who had supervised Higgs during that time, also took part in the teacher training session that afternoon.  Williamson also observed Higgs and concluded that something was awry.  Williamson considered Higgs to be engaging in inappropriate behavior.  Specifically, Williamson observed that Higgs “had most of her body slumped across the table.”  Williamson also noted that Higgs was wearing dark glasses, which she was taking on and off.  Williamson further observed that Higgs was being somewhat disruptive by talking to the person sitting next to her.

Williamson left the meeting and called Michelle Quigley, R.N., the medical administrator of the Chicago Public Schools to report what she and Murray had observed.  Quigley concluded that a drug screen was appropriate and made arrangements to have Higgs escorted by security forces to Mercy Works for a drug screen.

Williamson returned to the training session and observed that Higgs was still slumped across the table, fidgeting, taking her glasses off and on, and acting disruptive.  When the security forces arrived at Hayt School, Higgs refused to go to Mercy Works.  Williamson asked the security guard to escort Higgs out of the area because she was talking loudly and acting in a belligerent manner.  Higgs was escorted from the school.  Eventually, at approximately 4:15 p.m., Higgs went to Mercy Works on her own and provided a urine sample for testing.
(footnote: 1)
 Diana Grabowski, an employee at Mercy Works and certified to administer drug screenings, performed Higgs' test.  Grabowski noted on the Mercy Works form that Higgs drank a large quantity of water while she was in the Mercy Works waiting room.  Higgs drank approximately 30 ounces, cup after cup, until she vomited into the waste can.  Grabowski found Higgs' behavior unusual, so she telephoned Quigley to inform her of it.

Higgs' urine sample was sent to MedTox for analysis.  Results of the analysis showed positive for tetrahydrocannabinol (THC), a marijuana metabolite.  The concentration in Higgs' sample was 29 nanograms per millileter, which was a positive result.  After MedTox returned the results of its analysis to Mercy Works, these results were reviewed by a medical review officer who concluded that there were no mitigating circumstances he could uncover to warrant the conclusion that the test results were inaccurate.

On February 2, 1999, Higgs was charged by Chicago Public Schools' chief executive officer, Paul Vallas, with the following: (1) violating section 3-12 of the Chicago Public Schools Employee Discipline Code, which prohibits employees from reporting to work under the influence of alcohol or illegal drugs; (2) violating the Chicago Public Schools drug and alcohol testing policy; and (3) conduct unbecoming a teacher in the Chicago Public Schools.  Higgs made a timely request for a hearing.

A hearing was held before hearing officer Edward Suntrup.  During the hearing, Higgs alleged that there were mitigating circumstances.  She presented testimony that she had been exposed to passive inhalation of marijuana smoke exhaled by her HIV-positive sister, but also admitted that she had smoked marijuana two days before her drug test.  The hearing officer rejected the passive inhalation claim and noted that the results of Higgs' urine test were considerably higher than that which would result from passive inhalation.  He further found that her admission that she smoked marijuana two days before the test was insufficient to explain why Murray smelled a strong odor of marijuana on Higgs.

  On September 15, 2000, the hearing officer upheld the charges against Higgs and recommended that the Board dismiss her from its employment.  He concluded that the preponderance of the evidence in the record warranted the conclusion that Higgs violated the 1997 Board Rule 4-50 when she came to work as a grade school teacher under the influence of a controlled substance.  He further concluded that Higgs committed an act which the Board's personnel policy designates as both a serious disruption and a gross disruption of the orderly educational process in the classroom and in the school.  He also concluded that Higgs violated section 4-3 of the Employee Discipline Code, which prohibits employees from involvement in the illegal use of a controlled substance on the jobsite during hours of employment.  On October 25, 2000, the Board adopted the recommendation that Higgs be dismissed.

On November 28, 2000, Higgs filed a complaint for administrative review with the circuit court of Cook County.  On November 7, 2001, Circuit Court Judge Julia M. Nowicki issued a memorandum opinion and order finding that the evidence in the record supported the Board's decision to dismiss Higgs.  Additionally, Judge Nowicki deemed Higgs' conduct to be irremediable 
per se
 because her act caused damage to the students, faculty, and school.  Higgs filed a timely notice of appeal on December 7, 2001.

STANDARD OF REVIEW

This court's standard of review of a hearing officer's decision is governed by the Administrative Review Law. 735 ILCS 5/3-101 
et seq.
 (West 1996).  The hearing officer is responsible for weighing the evidence, determining the credibility of the witnesses and resolving conflicts in testimony. 
Prato v. Vallas,
 331 Ill. App. 3d  852, 861, 771 N.E.2d 1053, 1059 (2002).  On administrative review, it is not this court's function to reweigh the evidence or make an independent determination of the facts. 
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d  76, 88, 606 N.E.2d 1111, 1117 (1992).
  Our function instead is to ascertain whether the findings and the decision are against the manifest weight of the evidence.  
Abrahamson
, 153 Ill. 2d at 88, 606 N.E.2d at 1117; see also 
Launius v. Board of Fire & Police Commissioners
, 151 Ill. 2d  419, 427-28, 603 N.E.2d 477, 481 (1992) (in determining whether findings are against the manifest weight of the evidence, reviewing court does not weigh the evidence to determine where the preponderance of the evidence lies).  A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident." 
Abrahamson
, 153 Ill. 2d at 88, 606 N.E.2d at 1117.

Our review extends to all questions of law and fact presented by the entire record.
 Abrahamson
, 153 Ill. 2d at 88, 606 N.E.2d at 1117.  Thus, regardless of the reasoning of the agency, on administrative review, this court may affirm an agency's decision on any basis appearing in the record. 
Rogy's New Generation, Inc. v. Department of Revenue
, 318 Ill. App. 3d  765, 771, 742 N.E.2d 443, 448 (2000); 
Midwest Central Education Ass'n v. Illinois Educational Labor Relations Board
, 277 Ill. App. 3d  440, 448, 660 N.E.2d 151, 156 (1995).

ANALYSIS

In this appeal, plaintiffs have raised several arguments that essentially translate into two separate issues: (1) whether cause for dismissal existed in the first instance and, if so, (2) whether the cause was irremediable warranting immediate dismissal without a written warning, or remediable warranting a written warning and progressive discipline. See, 
e.g.
, 
Board of Education v. Harris
, 218 Ill. App. 3d 1017, 1022, 578 N.E.2d 1244, 1248 (1991) (if tenured teacher is not given written warning prior to dismissal proceedings, Board has burden of proving not only that cause for dismissal existed but also that cause was irremediable).  We shall discuss these issues separately.

Cause for Dismissal

The hearing officers in these cases found by a preponderance of the evidence that Higgs and Younge were under the influence of marijuana while teaching elementary school students.  These findings were based on documentary evidence, as well as credibility determinations the hearing officers made after observing testimony of the teachers, the administrators who observed the teachers' behaviors and then referred them for drug testing, the drug testing experts, the teacher's co-workers and other witnesses called by the teachers.  We conclude that the hearing officers' findings, that cause existed to discharge Higgs and Younge because they were under the influence of marijuana while at work, were not against the manifest weight of the evidence.

Indeed, plaintiffs concede that pursuant to the policies of the Board, dismissal is one of the disciplinary options for “reporting to work under the influence of alcohol or illegal drugs” and “involvement in the illegal *** use of any controlled substance either on or off the job site during hours of employment or non-working time.”  They argue, however, that the hearing officers failed to acknowledge their progressive discipline arguments and that it was improper for the Board to discharge them without warning.  We shall discuss this issue next. 

Irremediability of Plaintiffs' Conduct

Having now determined that the Board had cause to dismiss plaintiffs, the second issue we must decide is whether the cause for dismissal - reporting to work as an elementary school teacher under the influence of marijuana - was remediable or irremediable.  B
efore a teacher may be dismissed for remediable conduct, she must receive a written warning to cease that conduct, but a teacher may be immediately dismissed for irremediable conduct. 105 ILCS 5/34-85 (West 1996).
  The Board concluded that
 reporting to work under the influence of marijuana was irremediable, warranting discharge without a written warning.

It is well settled that the determination of whether a cause for dismissal is remediable or irremediable is a question of fact that involves the exercise of judgment and, therefore, lies within the discretion of the fact finder. 
Prato v. Vallas
, 331 Ill. App. 3d  852, 864, 771 N.E.2d 1053, 1061 (2002); 
Board of Education of Joliet Township High School District No. 204 v. Illinois State Board of Education
, 331 Ill. App. 3d  131, 135, 770 N.E.2d 711, 714 (2002).  The Board's findings that plaintiffs' conduct was irremediable will not be reversed by this court unless the decision is against the manifest weight of the evidence or the Board acted in an arbitrary or capricious manner.
 
Board of Education of Sparta Community Unit School District No. 140 v. Illinois State Board of Education
, 217 Ill. App. 3d  720, 728, 577 N.E.2d 900, 905 (1991).

Plaintiffs argue that the hearing officers, in determining that their conduct was irremediable, did not properly apply 
Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622
, 67 Ill. 2d  143, 365 N.E.2d 322 (1977).  In 
Gilliland
, t
he Illinois Supreme Court set forth the following two-pronged test for determining whether a cause for dismissal was irremediable: (1) whether damage was done to students, the faculty, or the school, 
and
 (2) whether the conduct could not have been corrected had superiors warned the individual charged. 67 Ill. 2d at 153, 365 N.E.2d at 326.  Subsequent to the 
Gilliland
 decision, however, numerous cases held that the 
Gilliland
 test was inapplicable to conduct that was immoral or criminal. See, 
e.g.
, 
Board of Education v. Harris
, 218 Ill. App. 3d  1017, 1023, 578 N.E.2d 1244, 1248 (1991) (teacher's criminal conduct is irremediable 
per se 
regardless of test); 
Board of Education of Sparta Community Unit School District No. 140 v. Illinois State Board of Education
, 217 Ill. App. 3d  720, 729, 577 N.E.2d 900, 905 (1991) (second prong of test is not appropriate where conduct in question is "immoral conduct"); 
McCullough v. Illinois State Board of Education
, 204 Ill. App. 3d  1082, 1090, 562 N.E.2d 1233, 1238 (1990) (second prong of test is inapplicable to situations involving the criminal conduct of a teacher); 
Fadler v. State Board of Education
, 153 Ill. App. 3d  1024, 1028-29, 506 N.E.2d 640, 644 (1987) (second prong of test is not appropriate in situations involving immoral conduct by a teacher that “has no legitimate basis in school policy or society”);
 McBroom v. Board of Education of District No. 205
, 144 Ill. App. 3d  463, 473, 494 N.E.2d 1191, 1198 (1986) (second prong of test is inapplicable to situations involving the criminal conduct of a teacher); 
Board of Education of Argo-Summit School District No. 104, Cook County v. Hunt
, 138 Ill. App. 3d  947, 952-53, 487 N.E.2d 24, 27-28 (1985) (explaining that it would be very difficult, if not impossible, to satisfy the second prong of the remediability test if it took only a promise never to engage in the improper conduct again, and that the more appropriate focus in cases alleging immoral conduct is not whether the conduct itself could have been corrected by a warning, but whether the effects of the conduct could have been corrected). 

As the court in 
McBroom
 explained:

“[R]emediable conduct is misconduct by a teacher, in her ordinary course of duties, which, if called to her attention, can ordinarily be remedied.  Thus, such conduct has been applied to a variety of fact situations in which the complained of conduct has concerned either deficiencies in teaching performance [citation] or corporal punishment [citation].

We hold the concept was not intended to apply to criminal conduct which has no legitimate basis in our society.  Teachers, as leaders and role models, with their education and background, have the duty to implant basic societal values and qualities of good citizenship in their students.  To claim that such conduct was remediable distorts the thrust and purpose of the rule. Criminal activity of this nature is conduct which cannot be remedied by a warning.” 
McBroom
, 144 Ill. App. 3d at 473-74, 494 N.E.2d at 1198. 

We agree with the reasoning of those cases that a warning serves no purpose for conduct that is criminal or immoral.  A warning here would have served no purpose. Plaintiffs were already aware that reporting to work under the influence of an illegal drug was proscribed conduct under relevant sections of the Employee Discipline Code and other Board policies.  Thus, such conduct cannot be remedied by a warning.

There is no need, however, to apply the 
Gilliland
 test in this case.  
Gilliland
 was decided almost 20 years before the 1995 Chicago school reform amendments (Public Act 89-15, §5, effective May 30, 1995)(Chicago School Reform Act).  The Chicago School Reform Act was enacted in 1988 in an attempt to resolve certain serious problems in Chicago's public school system.
 Fumarolo v. Chicago Board of Education
, 142 Ill. 2d  54, 61-62, 566 N.E.2d 1283, 1286 (1990).  In 1995, the legislature specifically amended section 34-85 of the School Code (105 ILCS 34-85 (West 1996), and added the following language to the statute: “No written warning shall be required for conduct on the part of a teacher or principal which is cruel, immoral, negligent, or criminal 
or
 which in any way causes psychological or physical harm or injury to a student as that conduct is deemed to be irremediable.”(Emphasis added.) 105  ILCS 34-85 (West 1996).
(footnote: 2)  This amendment is consistent with the reasoning of those cases which concluded that the 
Gilliland
 test was inapplicable to conduct that was immoral or criminal, and goes even further than those cases by including cruel and negligent conduct.  Such conduct is irremediable 
per se
.

When an unambiguous statute is amended, it usually indicates a purpose to effect some change in the law as it formerly existed. See,
 e.g.
, 
In re Detention of Lieberman
, 201 Ill. 2d  300, 

321, 776 N.E.2d 218, 230 (2002); see also 
Powell v. Board of Education of the City of Peoria, District 150
, 189 Ill. App. 3d  802, 807, 545 N.E.2d 767, 770 (1989).  Although this presumption of an intention to change the law can be rebutted (
In re Detention of Lieberman
, 201 Ill. 2d at 321-22, 776 N.E.2d at 230-31), the circumstances surrounding this legislative amendment only strengthen this presumption.  At the time of the amendments to the Chicago School Reform Act, the Illinois General Assembly determined that an “education crisis” existed in the Chicago Public Schools. 105 ILCS 5/34-3.3 (West 1996).  Thus, pursuant to section 34-85 of the School Code (105 ILCS 5/34-85 (West 1996)), it is unnecessary to employ the 
Gilliland
 test to cases involving cruel, immoral, negligent, or criminal conduct because the statute now makes this conduct irremediable 
per se
.  Not only is no warning required for this type of conduct, but it is also unnecessary for the Board to show that this type of conduct caused damage.

Although the hearing officers, in rendering their decisions, did not expressly rely upon section 34-85 of the School Code, both hearing officers found that plaintiffs' reporting to work under the influence of marijuana not only violated several of the Board's rules and policies, but also constituted immoral conduct.  Moreover, the hearing officer in Younge's case expressly found, by implication, that Younge had used marijuana, which itself was criminal conduct.  Higgs admitted using marijuana.  A teacher who reports to work under the influence of marijuana, an illegal drug, engages in criminal conduct that is irremediable 
per se
.  A teacher dismissal case requires proof by a preponderance of the evidence whereas proof beyond a reasonable doubt is required for conviction of criminal charges. 
Hall v. Board of Education of City of Chicago
, 227 Ill. App. 3d  560, 580, 592 N.E.2d 245, 259 (1992). Plaintiffs' dismissal without written warning and without progressive discipline was appropriate.
  

Plaintiffs have also argued that the hearing officers misapplied 
Chicago Board of Education v. Payne
, 102 Ill. App. 3d  741, 430 N.E.2d 310 (1981).  In 
Payne
,
 a teacher was arrested for, and pled guilty to, possession of marijuana for which he received a sentence of probation.  After the teacher was arrested a second time, for possession of marijuana and a controlled substance, this information came to the attention of school officials from a newspaper article.  Although the criminal conduct there did not involve students or occur on the school's premises, the 
Payne
 court held that the teacher's possession of marijuana was irremediable conduct for which a warning would not have remedied the damage.  The 
Payne
 court stated as follows:

"We are aware of the special position occupied by a teacher in our society.  As a consequence of that elevated stature, a teacher's actions are subject to much greater scrutiny than that given to the activities of the average person.  We do not doubt that knowledge of a teacher's involvement in illegalities such as possession of marijuana would have a major deleterious effect upon the school system and would greatly impede that individual's ability to adequately fulfill his role as perceived by the Board."
 Payne
, 102 Ill. App. 3d at 748, 430 N.E.2d at 315.

As noted by one of the hearing officers, the Illinois Supreme Court has observed, in a different context, that there “is a compelling interest in providing a proper educational environment for students, which includes maintaining its schools free from the ravages of drugs.” 
People v. Dilworth
, 169 Ill. 2d 195, 661 N.E.2d 310 (1996).  Although plaintiffs devote a substantial portion of their brief to the factors considered by the 
Payne
 court, the decision in
 
Payne
 pre-dated the 1995 amendment to the School Code and is not controlling.  In any event, we
 agree with the Board that because both incidents of possession in 
Payne
 occurred off school grounds, the Board here had an even stronger basis for discharging Younge and Higgs than it had for discharging 
Payne
.  In summary, the hearing officers correctly concluded that the cause for dismissal here,
 i.e.
, reporting to work under the influence of marijuana, was irremediable.

CONCLUSION

In accordance with the foregoing, we affirm the Board's decision to discharge plaintiffs Louella Higgs and Wynona Younge without a written warning for reporting to work under the influence of marijuana.

Affirmed.

O'BRIEN, P.J., and FROSSARD, J., concur.

FOOTNOTES
1:
The hearing officer later noted that this refusal was in direct violation of the Administrators' Guidelines and Procedures for Reasonable Suspicion Testing and Fitness for Duty Examination (the Guidelines), which was adopted by the Board on June 2, 1997, and which explicitly states that “the potentially affected employee should not be allowed to proceed alone to the collection site or from the collection site.”  The hearing officer found that Higgs went
 for testing six hours after the assistant principal signed the reasonable suspicion document and four hours after the principal signed it.  After considering Higgs' excuse that she had to pick up her children, he noted that the Guidelines provide that an “employee's failure to submit to reasonable suspicion testing will be considered insubordination and will subject the employee to discipline, up to and including discharge.”

2:
This language is the same as that now found in section 4-8 of the Employee Discipline Code