2024 IL App (1st) 232212-U

SECOND DIVISION
August 27, 2024

No. 1-23-2212

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| LOUISE DEBERRY, | ) | |
| | ) | |
| Respondent-Appellant, | ) | |
| | ) | Petition for Review |
| v. | ) | of Order of Board |
| | ) | of Education of |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO; | ) | City of Chicago |
| CHIEF EXECUTIVE OFFICER OF THE CHICAGO BOARD | ) | |
| OF EDUCATION, PEDRO MARTINEZ; BOARD OF | ) | Board Resolution |
| EDUCATION OF THE CITY OF CHICAGO PRESIDENT, | ) | 231025RS5 |
| JIANAN SHI; ILLINOIS STATE BOARD OF EDUCATION; | ) | |
| ISBE HEARING OFFICER, BRIAN CLAUSS, | ) | |
| | ) | |
| Petitioners-Appellees. | ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*:    School board's decision to dismiss tenured teacher from her employment confirmed where it was not clearly erroneous.

¶ 2    Louise DeBerry directly appeals from a final administrative decision of the Board of Education of the City of Chicago (Board or school board) to terminate her employment as a tenured school teacher due to negligent, cruel, immoral, and irremediable conduct. See 105 ILCS 5/34-85(a)(8) (West 2022) (providing for direct appeal in the First District). DeBerry was assigned to

James Wadsworth Elementary School (Wadsworth), which is located in the Woodlawn neighborhood at 6650 South Ellis Avenue. The Board dismissed DeBerry after determining that she grabbed a student by the collar in 2017 and struck a student on the forehead with a ruler while trying to strike another classmate in 2018. DeBerry contends that the findings were against the manifest weight of the evidence and that after she engaged in protected union activity in October 2017, the principal retaliated against her by coaching students to make false accusations in May 2018. She also argues that the consideration of "obviously stale allegations" that she also shoved a student into a wall in 2015 insinuated that she is a violent person, which prejudiced the hearing officer. The biased hearing officer then deprived her of due process by allowing improper questions, questioning witnesses directly in order to evade her objections, and changing testimony in order to support the charges. The Board responds that the findings were consistent with the manifest weight of the evidence; the Board disregarded the 2015 incident as immaterial and dismissed DeBerry due to her conduct in 2017-18; and that although DeBerry disagrees with the outcome, she has not shown bias.

¶ 3    Article 34 of the Illinois School Code governs the dismissal of tenured school teachers and provides that when charges are initiated by the general superintendent and served upon the teacher, the teacher has a right to request a hearing before a hearing officer. 105 ILCS 5/34-85(a)(1) (West 2018) (School Code). After the hearing, the hearing officer will issue findings of fact and a recommendation as to whether the teacher should be dismissed. 105 ILCS 5/34-85(a)(6) (West 2018). "[T]he hearing officer acts as the factfinder and in that capacity hears the testimony of witnesses, determines their credibility and the weight to be given their statements, and draws reasonable inferences from all evidence produced in support of the charges against the accused."

1-23-2212

*Ahmad v. Board of Education of City of Chicago*, 365 Ill. App. 3d 155, 162 (2006). Then the school board decides whether to dismiss the teacher. 105 ILCS 5/34-85(a)(7) (West 2018).

¶ 4     We review the decision of the board, not the hearing officer. *Ahmad*, 365 Ill. App. 3d at 162. The standard of review depends on whether the issue presented is a question of fact, a question of law, or a mixed question of fact and law. *James v. Board of Education of City of Chicago*, 2015 IL App (1st) 141481, ¶ 12. We review the agency's conclusion on a question of law *de novo*. *James*, 2015 IL App (1st) 141481, ¶ 12. We will not disturb factual findings unless they are contrary to the manifest weight of the evidence. *James*, 2015 IL App (1st) 141481, ¶ 12. Factual findings are against the manifest weight of the evidence only if the opposite conclusion if clearly evident. *James*, 2015 IL App (1st) 141481, ¶ 12. A mixed question of fact and law involves an examination of the legal effect of a given set of facts, and it is reviewed under a clearly erroneous standard. *James*, 2015 IL App (1st) 141481, ¶ 12.

¶ 5     A tenured teacher cannot be removed from his or her employment except for cause. 105 ILCS 5/34-85(a) (West 2018). If a teacher's misconduct is "remediable," then the teacher must be given reasonable warning, in writing, that their misconduct may result in charges. 105 ILCS 5/34-85(a) (West 2018). "Remediable" conduct is conduct that can ordinarily be remedied if it is called to the teacher's attention. *Ahmad*, 365 Ill. App. 3d at 163.

¶ 6     No written warning is required for conduct "that is cruel, immoral, negligent, or criminal or that in any way causes psychological or physical harm or injury to a student, as that conduct is deemed irremediable." 105 ILCS 5/34-85(a) (West 2018). In its appellate brief, the Board states that "misconduct meeting this statutory definition is often referred to as '*per se* irremediable.' " "[W]here teachers indulge in conduct that is immoral at best, and criminal or quasi-criminal at

- 3 -

worst, they demonstrate a basic character flaw which makes their future employment at the Board of Education, which is partially responsible for molding the character of our youth, untenable." *Ahmad*, 365 Ill. App. 3d at 166-67. Whether misconduct is irremediable is a question of fact. *Crawley v. Board of Education of City of Chicago*, 2019 IL App (1st) 181367, ¶ 17. In addition to the statute's definition, this administrative hearing officer used the standard for irremediable conduct that the Illinois Supreme Court set out in *Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622 of Tazewell County*, 67 Ill. 2d 143, 153 (1977). The *Gilliland* analysis consists of two prongs: "whether damage has been done to the students, faculty, or school and whether the conduct resulting in that damage could have been corrected had the teacher's superiors [given] warn[ing]." *Id.*

¶ 7 A hearing into DeBerry's conduct was completed by videoconferences on October 20, 2020; June 9, 2022; and June 27, 2022. The Board called eight witnesses including three alleged student victims; two of their parents; and Wadsworth's security guard, principal, and one of its teaching staff. DeBerry testified and called two of her former Wadsworth colleagues.

¶ 8 Ja.J.–then a 15-year-old high school student–testified that she was 10 years old when she was in DeBerry's fifth grade reading class in 2015. When the class was lining up one day, Ja.J. cut in front of a slow-walking student, they argued, and Ja.J. refused to change places. According to Ja.J., DeBerry came over, aggressively told Ja.J. to move, and then pushed Ja.J. once or twice, shoving her into a wall. Ja.J. was trying to explain what had happened in the line but DeBerry did not listen to her. DeBerry faced Ja.J. and used a hand to shove her "shoulder, chest area." Ja.J. went to Principal Shabazz's office where they watched the security camera footage that was viewed by the hearing officer. Ja.J. denied that she "jumped across the hall." After the incident,

she no longer felt safe in DeBerry's classroom.

¶ 9     This court has viewed the security camera footage. It shows the school's security guard, Clinton Smith, coming over to the commotion in the hallway and then standing in the middle of the wide hallway while DeBerry moves Ja.J. out of the line of students, to the middle of the hallway, where Smith was standing. DeBerry then shoves Ja.J., pushing her forcefully enough that she hits the opposite wall and bounces off of it. Ja.J. and DeBerry then step towards each other, and, after a moment, Smith steps between them. DeBerry and the class then walk off in one direction, while Smith and Ja.J. walk away in the other direction.

¶ 10    Smith testified that he had been a security officer at Wadsworth for about seven years. DeBerry was his coworker and they were not friends outside of work. He saw DeBerry pull Ja.J. out of line and push her to the opposite wall. Ja.J. then "kind of came back at [DeBerry]," so Smith stepped between them and reminded the teacher that "this is a kid." He could not recall the contents of a statement that he wrote in 2015. He viewed the video and agreed that he did not see Ja.J. swing her arms at DeBerry.

¶ 11    Jo.J. was a 14-year-old eighth grader when he testified about having DeBerry as his fourth-grade homeroom and reading teacher during the 2017-18 school year. The first instance that DeBerry "was physical" with him was when she yanked on the right side of his polo shirt collar. The class was lining up after lunch and he was "[p]robably" misbehaving. She pulled with such force that a button popped off of his shirt and his neck hurt for the rest of the day. He did not tell the principal or go see the school nurse. He talked with his mom after school about what happened. On another day when they were lining up in the hallway, he was misbehaving and DeBerry struck his left calf with a long ruler (more than 12" long), striking so hard that the ruler snapped. Although

Jo.J. was not hurt, he thought that his teacher's action was inappropriate and that someone in a "professional position *** should have enough self-control or patience to not hit [a student]." Jo.J. also recalled DeBerry hitting his classmate M.M. When Jo.J. was asked if there were other instances when DeBerry hit students, DeBerry objected, and, because she addresses this exchange on appeal, we will detail it as relevant below. Jo.J. denied telling teachers during the subsequent school year (fifth grade) that he intended to get DeBerry fired. He acknowledged that when he misbehaved in DeBerry's class, she would call his mother, which he did not like.

¶ 12     Jo.J.'s mother, Ms. L., testified that she went to the school later that week and told DeBerry, "I don't send him to school to be disciplined in that way." There had also been an incident when DeBerry pulled Jo.J.'s ear and made it "really red." Ms. L. told her son to behave himself and, if there was another incident, that he had her permission to excuse himself and immediately go talk to the principal.

¶ 13     J.W. was a seventh grader when he testified. In May 2018, during fourth grade, M.M. was one of his classmates and DeBerry was their reading teacher. M.M. was "acting up," so DeBerry asked J.W. to go across the hall to get another teacher, Antoine Brown. While J.W. was walking towards Brown's room, DeBerry "swung the yardstick back" and struck J.W.'s forehead as she brought the ruler forward to hit M.M. DeBerry had hit M.M. prior to this incident and "usually hit him [on the back] when he was doing something wrong." J.W. had a visible "knot" above his right eyebrow and was pained and dizzied. DeBerry asked another student to take J.W. to the bathroom so he could put water on his injury. Later in the day, DeBerry phoned his mother and he overheard DeBerry saying "it was not that bad." J.W.'s contemporaneous written statement and photos that his mother took of his forehead were admitted into evidence. J.W. also recalled that DeBerry used

the "meterstick" to hit another classmate, Jo.J., on the back "[w]henever he was acting up." J.W. acknowledged that DeBerry did not intend to hit him and that he did not go to the hospital. The Board objected to a "confusing" cross-examination and the hearing officer then briefly asked J.W. about Brown's involvement.

¶ 14    J.W.'s mother, Ms. W., testified that DeBerry phoned her about 20 minutes before J.W. got home from school with a 2" long "egg" at the center of his forehead. There was a "little scratch or cut" in the middle that was bleeding and J.W. was crying and in pain. Ms. W. identified photos she took of the injury, including one that she took a few days later that showed that the cut had scabbed over. J.W. told her that when DeBerry went to hit M.M. with the "yardstick," she first hit J.W. with the tail end of it. Ms. W. gave her son some children's ibuprofen. She could not reach Principal Shabazz, so she called the Chicago Public Schools' (CPS) downtown office and learned that they knew nothing about the incident. She went down to Wadsworth at around 4:00 p.m. and met with the assistant principal, who also knew nothing about the incident. DeBerry was called to the office and Ms. W. asked her why she had not given J.W. an ice pack, had called from her personal cell phone, and had not written an incident report. Ms. W. went back to Wadsworth the next day to meet with the principal and DeBerry, stated "how it was inappropriate to even be hitting a child" and again questioned the lack of any incident report. J.W. still had a headache a day or two after being injured so she took her son to his pediatrician. She recalled telling the Board investigator that J.W. was afraid of DeBerry but that he was concerned about the repercussions that she might face. J.W. saw a therapist for the rest of the school year. Ms. W. was furious about the incident and tried to remove him from DeBerry's class but could not because Wadsworth was a selective enrollment school. She denied telling DeBerry during her initial cell phone call, "Don't

worry, Ms. DeBerry, my son comes home from school with bumps and bruises all the time."

¶ 15   Antoine Brown testified that he had been a CPS special education classroom assistant for over ten years. J.W. came to Brown's room to ask him to come help DeBerry with M.M. J.W. was not holding his forehead, complaining of an injury, or saying that DeBerry hit him. Brown saw that DeBerry had a ruler. Brown e-mailed the principal, stating that DeBerry struggled to get M.M. into Brown's lab, she was holding a ruler, M.M. was "shaking widely and was not cooperating," and Brown never saw her strike either of the two boys. Brown denied taunting or teasing M.M. for crying after the incident. At the time, Brown had worked with DeBerry for about four or five years and never saw any indication that students feared her. He was a "mandated reporter," meaning that if he observed harm to a student, he was required to report it to the school administration or DCFS. If M.M. had said that DeBerry struck him, Brown would have reported that. He never reported DeBerry for striking a student.

¶ 16   Rashid Shabazz testified that DeBerry was already employed at Wadsworth when he became the school's principal in 2012. Each year, Shabazz reviewed the teachers' handbook with his staff and gave each of them a hardcopy and electronic access. The handbook provides that students will be educated in a nurturing and supportive environment and that staff will provide a safe, warm, and caring atmosphere. The intention is to provide an environment in which students can reach their highest potential. Shabazz worked with DeBerry for about five years. She "wasn't the most cooperative" or "a team player" and could be "very challenging." She did not collaborate with her team and would be absent on professional development days. Her interactions with students were "between neutral and a mixed bag." She did not, for example, want or "really feel comfortable with diverse learners in her classroom," so she did not give those students much

attention.

¶ 17    In 2015, before Shabazz knew that DeBerry had pushed Ja.J. into the opposite wall earlier in the day, DeBerry asked what would happen to a student who put her hands on a teacher. DeBerry gave Shabazz the parent's phone number to follow up. Shabazz called and learned that the parent met with DeBerry earlier that day, but during that meeting, DeBerry had given no indication that the student touched her. Shabazz next spoke with security guard Smith who said that DeBerry grabbed and pushed the student to the wall and had been "aggressive" to the point that Smith thought DeBerry "forgot she was in the school and that she was dealing with a child." Shabazz then watched the security video. It showed that DeBerry was untruthful and confirmed what Smith said: Ja.J. never struck DeBerry, waved her arms about, or did "anything like that." If Ja.J. had actually made physical contact, then DeBerry should have immediately reported that to the principal or the administration, rather than waiting until the end of the day, and should have immediately completed an incident report. A teacher hitting a student or vice versa would be a "serious, serious, serious offense" that should be documented immediately and dealt with immediately. The incident occurred at about noon and the school day did not end until after 3:00 p.m. Shabazz completed an incident report himself, stating that there was no reason for DeBerry to have made physical contact with Ja.J., and that Smith was standing in the vicinity and could have removed her from the line if DeBerry had asked. Also, DeBerry had not stated during her initial meeting with Ja.J.'s mother that DeBerry had been struck by Ja.J.; DeBerry first made that claim when talking with Shabazz later in the day and she had falsely denied grabbing, pulling, or pushing the student.

¶ 18    Regarding DeBerry's incident with J.W. and M.M. in 2018, Shabazz testified that it was

"problematic" to learn about the encounter from the network office rather than from DeBerry. She did not follow the reporting procedures in the staff handbook or obtain first aid from the school nurse, physical education teacher or main office clerks. He thought it was "odd" and "peculiar" that she held a "yardstick" and purported to use it to teach Venn diagrams, because she did not teach math, Venn diagrams are circular and are printed in the workbooks, and "[m]any teachers use popsicle sticks or even index cards" for this activity rather than a ruler. DeBerry told him that instead of completing an incident report, she called J.W.'s mother, and was still working on an incident report about M.M. Shabazz asked her for the report, even if it was incomplete, because it was already a day late and he was "trying to grasp what indeed took place." She refused and said that she would finish it later that day. He did not believe that she had even started a report. J.W. and M.M. were given privacy to write their own accounts of what had happened. They used rooms that were separate from the administrative offices and neither Shabazz nor the assistant principal told the students what to write. Shabazz denied fabricating or exaggerating DeBerry's incidents with Ja.J. in 2015 or J.W. and M.M. in 2018.

¶ 19    During Shabazz's testimony, the Board asked to admit the Board investigator's report into evidence. It consisted of 14 single-spaced typewritten pages, electronic records of the incident and investigation, photographs of the ruler, photographs of J.W.'s injured forehead, DeBerry's incident report, Brown's e-mail to Shabazz, the assistant principal's statement, J.W.'s statement, and M.M.'s statement. DeBerry objected on hearsay grounds as M.M. and his mother were not available to testify. DeBerry also objected on the basis of authenticity, as the statements bore multiple dates. Shabazz was then asked about the multiple dates and stated that May 18th was when he asked for the written statements and May 24th was when the Board's investigator came

to the school. Shabazz had no explanation for the date of May 21st. The hearing officer admitted into evidence the statements written by people who had or would be testifying and admitted the other records for non-hearsay purposes including records made in the course of an investigation. According to the investigator, DeBerry struck students with a "meter ruler," "yardstick," or "ruler." J.W. told the investigator that DeBerry sent M.M. to stand in a corner and J.W. disputed DeBerry's statement that M.M. then began "banging on the counter, hitting books or swinging at the flag." J.W. told the investigator that M.M. only moved to pick up a pen, at which point DeBerry told J.W. to go get Brown and she grabbed M.M. with one hand while holding a ruler in her other hand. When M.M. pulled his hand away, DeBerry struck both J.W. and M.M. The investigator also wrote that while she was interviewing J.W., he "became very apprehensive to answer questions because he was concerned about getting Ms. Deberry (*sic*) in trouble." The investigator contacted M.M., who said that DeBerry picked up the ruler from her desk, threatened him with it, took him to the classroom doorway, and then "hit him on his butt with the ruler." As he walked back into the classroom, asking why DeBerry hit him, she grabbed his arm and said that he was going to Brown's room. Once they were in the hallway, he pulled away from her and she hit him on the leg with the ruler. He did not see that she also struck J.W. M.M. also told the investigator that Brown saw DeBerry striking M.M. and that Brown shamed M.M. for crying. Shabazz's written statement was a separate exhibit from the investigator's report and it was also admitted.

¶ 20    Shabazz next testified that he agreed with the investigator's conclusion that DeBerry physically assaulted the three students. He was convinced of this by her failure to disclose the situations and timely complete incident reports, the video of Ja.J. being shoved across the hallway, and the photos of J.W.'s injured forehead. Also, Shabazz observed that students were intimidated

by DeBerry and were "robotic" compared to how they behaved around other teachers. He acknowledged that Ja.J. was not removed from DeBerry's class and that he told DCFS that Ja.J. was not in immediate physical danger. Shabazz also acknowledged that Ja.J. was disciplined for being disrespectful to DeBerry that day and DeBerry was not disciplined for the incident with Ja.J. in 2015 and was not "removed from [the] building" until after incidents with Jo.J., M.M. and J.W. in 2017-18.

¶ 21     DeBerry was a member of Wadsworth's "PPLC" or Professional Problems Committee (*sic*)[1] and Shabazz was aware that she filed union grievances against him. Terra Sinkevicius was another member of the PPLC and she filed an unfair labor practice charge against Shabazz that was still pending. Shabazz denied that DeBerry and Sinkevicius' involvement with the PPLC influenced him to take actions against either teacher.

¶ 22     DeBerry's first witness was Sinkevicius, who testified that she had been employed by CPS since 2009, was currently teaching at Bright Elementary School, taught at Wadsworth for the previous four years, and had transferred because Wadsworth's environment "had become very difficult because of protected activity [that she] engaged in." Sinkevicius formed Wadsworth's Professional Personnel Leadership Committee, which is a teachers' state-mandated committee that makes suggestions to the local school council, and she had been a member of Wadsworth's Professional Problems Committee, which was for teachers and the principal to resolve issues so they would not turn into union grievances. Sinkevicius filed an unfair labor practice charge against Shabazz because he had disciplined or "written [her] up about nine times within a three-month

---

[1] We note that according to a subsequent witness, Sinkevicius, the Professional Personnel Leadership Committee and the Professional Problems Committee were two different committees.

span." Sinkevicius never taught with DeBerry and was not part of her grade-level team, but Sinkevicius did observe students in positive interactions with DeBerry, such as hugging her, asking her for help, and joking with her. Sinkevicius never saw DeBerry hit a student. Sinkevicius acknowledged that she was disciplined for negligent supervision in 2019 and failing to timely submit her grades. She had also been disciplined at her new school, which she attributed to the fact that she "became a union delegate." She filed an unfair labor practice charge about that discipline. She received a warning from the Board "and then there's something else" that she could not recall the name of, but Sinkevicius said that "[a]ll those things only started after I got involved with protected activity." Prior to that, her "records were clean and pristine" which meant that "all the discipline [she received] is fabricated." She did not witness the shoving incident in 2015 or the student with a welt on his head in 2018. School administration "had allowed for students to just really get unruly and out of control."

¶ 23    Bridgett K. Jordan also taught at Wadsworth, as DeBerry's partner teacher. Jordan testified that she had been a CPS teacher for 21 years, spent seven years at Wadsworth, and was currently working at Dunn STEM Academy. Jordan had never seen DeBerry strike a student. Jordan never joined the two teacher committees and never filed a grievance or unfair labor practice charge against Shabazz.

¶ 24    DeBerry testified that she began teaching for CPS in 2000, was aware of the prohibitions on corporal punishment, had extensive training in classroom management and de-escalation techniques, and was familiar with the code of ethics and the disciplinary measures that were described in the student code of conduct.

¶ 25    Ja.J. was arguing with another student in line, so DeBerry told Ja.J. to go to the back of the

line, but Ja.J. was uncooperative and was yelling. DeBerry asked her to go to the other side of the hallway so they could talk about what was upsetting her and then DeBerry "attempted to guide her to the other side" by placing her hands on Ja.J.'s shoulder. Ja.J. was still yelling, "swinging her arm," and hitting DeBerry "below [the] belly." When asked why the video did not show Ja.J. "swinging her arms in any way, shape or form," DeBerry answered that Ja.J.'s "arm/elbow" was hitting her. When asked why DeBerry told the investigator that Ja.J. never struck DeBerry, she again said that Ja.J. used her arm or elbow instead of her hands. She denied ever being frustrated with Ja.J. and said that she handled this student's classroom interruptions by "just stop[ping] instruction just to let her have her moment" and then contacting her parent. DeBerry denied pushing Ja.J. and testified that Ja.J. is "dramatic," "So when I put my hands on her shoulder, she kind of threw herself to the wall, like she jumped to the wall." Security officer Smith scolded Ja.J. about hitting her teacher and took Ja.J. to the office while DeBerry called Ja.J.'s mother. The teacher, parent and student met privately. During their conversation, DeBerry described what occurred, Ms. J. looked at her daughter, Ja.J. apologized, and "her mom was like, I told you about your behavior, and then she went on to talk to her." Later that day, DeBerry completed a referral form about Ja.J.'s misbehavior and when she saw Shabazz, she told him what had occurred and asked him if Ja.J. would be disciplined. Even though students "would do things to teachers, *** nothing would be done," so DeBerry said "something will be done" in this instance. The next day, Shabazz called DeBerry to the office and accused her of falsifying her report, saying that DeBerry instead "threw" and "slammed" Ja.J. When security guard Smith came into the meeting, he said, "[DeBerry] didn't."

¶ 26    During the 2017-18 school year, Jo.J. was one of DeBerry's fourth grade students whom

she had to "constantly" discipline. Fourth graders were the worst class because they constantly fought. DeBerry would pull them apart and she denied ever hitting Jo.J. with a ruler or grabbing him by the collar. Instead of disciplining Jo.J., DeBerry would just call his mom.

¶ 27    Jo.J.'s classmate M.M. had similarly disruptive behavior. On the first day of school, M.M.'s mother said, " 'Ms. DeBerry, he's all yours. Discipline how you see fit.' " Even so, whenever DeBerry "had problems with him," she would just phone M.M.'s mom and had never touched M.J. or hit him with anything. One day, he left his seat, tried to take an autistic classmate's iPad, pushed the classmate and "kind of slapped him in his face." DeBerry had M.M. come stand by her, but while he was there, he began slapping books together, hitting the flag, and making noise, and when DeBerry said "M.M., stop, please stop," he threw a pencil eraser and went back to his desk. Because M.M. was "being disrespectful" and trying to get the class into an uproar, she told him to go to Brown's classroom, but he refused to go. She sent J.W. to get Brown from across the hall and then asked M.M. to come to her as she was approaching the classroom's door. When he refused, she went over to him, took his hand and "guided him out of the classroom." M.M. "was kind of resistant from going with [DeBerry], but he came along." However, as they stepped into the hallway, M.M. "went wild" and tried to get away. He hit and scratched and tried to pull her to the ground. Brown came out of his room and took M.M. DeBerry was holding an 18" ruler in the hallway, because her class was working on Venn diagrams and she was drawing a line on each of the students' papers where they could write comparative phrases. She denied hitting either M.M. or J.W. in the hallway with the ruler. When J.W. told her had been struck by the ruler, she gave him a hug, and sent him to the bathroom to put some cold water on his head. There was no swelling. The part-time nurse was not there. DeBerry did not tell the principal because he had instructed her

to stop sending kids to the office and to instead handle behavior in her classroom or send pupils to her buddy teacher. Even though J.W. was saying that he was alright, DeBerry insisted on calling his mom. The following day, DeBerry was writing an incident report when she was called to meet with the principal and J.W.'s mother. When Ms. W. complained, DeBerry reminded her that spoke earlier by phone and that Ms. W. said that her son came home from school with marks on him all the time. DeBerry acknowledged that her incident report lacked some of these details, but explained that she wrote the report quickly because of time constraints.

¶ 28    DeBerry filed an unfair labor practice charge against Shabazz in 2019 because she was tired of being treated differently than other teachers and filed two grievances against him because the union representative said that teachers could grieve about "behavior problems at the school." Shabazz later said that he could have fired all of the teachers and that he did not like "that we put a knife in his back in the union meeting, telling lies on him."

¶ 29    DeBerry denied using corporal punishment on any student since 2015 and said she knew that it was illegal in Illinois. Other than J.W., whom she had struck accidentally, all of the students were lying about being hit with the ruler. At this point in the proceedings, the hearing officer looked at photos of the ruler and described it as a half-meter ruler, slightly longer than 19". When asked whether there was anything that she would do differently in hindsight so that J.W. was not injured, DeBerry answered that none of this would have taken place if Shabazz had sent a substitute teacher and Ms. Ivy, so that diverse learners and general education students were not put together. When the question was repeated, DeBerry answered that she would not have involved J.W.

¶ 30    After the hearing officer issued a written report concluding that there was cause to dismiss DeBerry, the Board accepted the hearing officer's factual findings, made additional factual

findings from the record, determined there was cause for dismissal, and fired DeBerry.

¶ 31   Although the parties address DeBerry's conduct under both the School Code (105 ILCS 5/34-85 (West 2018)) and the supreme court's 1977 decision in *Gilliland* (67 Ill. 2d 143), we will limit our analysis to the statutory standard. Twenty years after *Gilliland*, the School Code was amended to provide that conduct that is "cruel, immoral, negligent or criminal or *** that in any way causes psychological or physical harm or injury to a student" is irremediable *per se*. *Younge v. Board of Education of the City of Chicago*, 338 Ill. App. 3d 522, 534 (2003) (citing 105 ILCS 34-95 (West 1996)). The 1995 amendment reflected numerous opinions indicating that the *Gilliland* standard does not apply to immoral or criminal conduct. *Younge*, 338 Ill. App. 3d at 532-33. The 1995 amendment went even further than precedent, by including cruel and negligent conduct. *Id.* at 533. Under the statute, "[n]ot only is no warning required for this type of conduct, but is also unnecessary for the Board to show that this type of conduct caused damage [to students, faculty, or the school]." *Id.* at 534. The teacher's failure is considered so severe that it cannot be remedied by a warning. *Id*. at 532-33.

¶ 32   DeBerry argues that no reasonable person would find that she acted in a cruel, immoral, negligent or criminal manner with Jo.J. in 2017. She contends that Jo.J. and his mother were not credible. She points out that when he first took the stand, he answered "No," when asked whether he recalled an incident with her that occurred at the beginning of the 2017-18 school year and that he could not place the incident in any particular part of the school year. She also cites his testimony that he misbehaved and did not like when she reported his conduct to his mother. She contends this shows that he "had a motive against DeBerry." As for his mother, DeBerry contends Ms. L.'s testimony that she informed the school about the incident was contradicted by Principal Shabazz's

denial and the lack of a contemporaneous report. Furthermore, there was no corroborating evidence, such as a deformed shirt or reports from any witnesses. Thus, the hearing officer's discussion of the incident was "completely counter to the testimony."

¶ 33 The Board's factual findings are presumed true and correct and can be reversed only if the opposite conclusion is "clearly evident." *Ahmad*, 365 Ill. App. 3d at 162**.** DeBerry has not shown an opposite conclusion is clearly evident by merely arguing that Jo.J. often misbehaved and had a motive to cause trouble for DeBerry or that the incident was not immediately documented. The hearing officer heard Jo.J. admit that he misbehaved and was "probably" misbehaving during the incident and also heard DeBerry's denial of ever grabbing his collar or subsequently breaking her ruler on his left calf. The hearing officer believed one witness over another and we do not redetermine witness credibility. *Wagner v. Board of Education of North Shore School District 112*, 2023 IL App (2d) 220453, ¶ 42. Ms. L.'s testimony about reporting the incident to Shabazz or another administrative staff member was equivocal and thus we disregarded those statements in our factual recitation above.

¶ 34 DeBerry also contends that the Board was allowed to bring in "information and allegations" beyond the charges against her and violated her due process rights under the School Code. Specifically, she cites a passage in which the hearing officer asked Jo.J. how many other students DeBerry struck, to explain his response, and to name the other student that DeBerry was "fighting in the hallway." She contends that this testimony was an "unfair surprise" and that the admission of this evidence was unfairly prejudicial.

¶ 35 We reject this claim because the transcript discloses that the hearing officer sustained DeBerry's objection. She was not harmed by brief testimony that was stricken.

¶ 36 Her last argument about Jo.J. is that there was "insufficient proof of any significant damage resulting from [her] conduct" and that her conduct could have been remediated with a warning.

¶ 37 We also reject this argument because the statute does not include a damage threshold, let alone a "significant damage" threshold.

¶ 38 Furthermore, the manifest weight of the evidence demonstrates that DeBerry's misconduct towards Jo.J. was not remediable with a warning and supports the Board's findings that she (1) inflicted pain or suffering, (2) used corporal punishment in response to student misbehavior, and (3) caused him to lack physical safety at his school; and that this was cruel. "Cruelty" is commonly understood to mean "the intentional infliction of mental or physical suffering on a living creature, especially a human." Black's Law Dictionary (12th ed. 2024); *Contreras v. Board of Education of City of Chicago*, 2023 IL App (1st) 220734, ¶ 46 (citing Black's Law Dictionary (11th ed. 2019)); *Village of Roselle v. Roselle Police Pension Board*, 382 Ill. App. 3d 1077, 1080 (2008) (primary rule of statutory construction is to ascertain and give effect to the intent of the legislature). In addition, the hearing officer noted and DeBerry herself testified that she was an experienced teacher who was quite familiar with the prohibitions on corporal punishment. Since DeBerry already knew that she should not grab Jo.J., this was not an incident that was correctable with a warning. Her cruelty to Jo.J. was irremediable. This incident alone would have been sufficient grounds for the Board to end her employment.

¶ 39 The Board further found, however, that DeBerry's conduct with Jo.J. was "immoral," in that it was "shameless conduct showing moral indifference to the opinions of the good and respectable members of the community" (*Ahmad*, 365 Ill. App. 3d at 165) and was "shocking, distressing, and [in] conflict[] with her responsibility to protect children." "[P]ublic school teachers

hold a special position of trust and moral leadership" (*Massie v. East St. Louis School District No. 189*, 203 Ill. App. 3d 965, 973 (1990)), and the School Code requires them to teach "respect, responsibility, fairness, caring, trustworthiness, and citizenship, in order to raise pupils' honesty, kindness, justice, discipline, respect for others, and moral courage." 105 ILCS 5/27-12 (West 2006). Conduct that has been deemed immoral and negligent includes failing to oversee the safety and well-being of students, as a tenured teacher did in *Ball v. Board of Education of City of Chicago*, 2013 IL App (1st) 120136, when she did not supervise her seventh- and eighth-grade special education students in violation of school policy. The lack of supervision allowed some of the students to engage in sexual activities in the school. *Id*. at ¶ 2. Illustrative cases about immoral and criminal conduct include *Younge*, 338 Ill App. 3d 522, and *Ahmad*, 365 Ill. App. 3d 155. In *Younge*, two tenured elementary school teachers were discharged without warning or progressive discipline for being at work in separate incidents in 1997 and 1998 under the influence of marijuana. *Younge*, 338 Ill. App. 3d 522. In *Ahmad*, 365 Ill. App. 3d at 165, a tenured teacher misrepresented herself as an agent of CPS so that she could buy donated school supplies at very reduced cost in order to resell the products for personal gain. DeBerry's actions were comparable to these three examples and the Board aptly characterized her behavior as "shocking, distressing, and [in] conflict[] with her responsibility to protect children." The evidence clearly showed that she not only failed to protect this student's safety and well-being, but that she was also the source of physical harm and pain in an environment that the teachers' handbook stated was supposed to be nurturing, supportive, safe, warm, and caring. DeBerry did not model fairness, caring, or respect for others. Her conduct was immoral.

¶ 40    The Board additionally found that a "reasonably careful person would not *** grab a

student by the collar" and, therefore, her conduct was "negligent," which the Board described as the "failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation." Negligence is illustrated by *James*, 2015 IL App (1st) 141481, ¶ 6, in which a high school social studies teacher who was athletic, "pretty strong" and also coached softball and football pretended to throw a stapler at a disruptive student. As the teacher "made a strong snapping motion with sufficient force to launch the stapler about ten feet through the air," the metal stapler detached from its plastic cover, flew across the room and struck a different student's head. *Id*. at ¶¶ 2, 10. The injured student needed medical treatment. *Id*. at ¶ 8. Although the teacher did not intentionally release the stapler or cause injury, the Board held that harm was "reasonably foreseeable," and thus, the actions were negligent and *per se* irremediable. *Id*. at ¶¶ 14-15.

¶ 41    Regardless of whether DeBerry intended to harm or injure Jo.J., it was reasonably foreseeable that grabbing a student by the collar, especially with sufficient force to pop off a button, would be harmful or injurious. The Board's negligence finding is amply supported by the facts here.

¶ 42    Furthermore, it is clear from this record that DeBerry caused Jo.J. physical harm or injury within the meaning of a statute that prohibits teacher's "conduct *** that in *any way* causes psychological or physical harm or injury to a student." (Emphasis added.) 105 ILCS 5/34-85(a) (West 2018).

¶ 43    The manifest weight of the evidence supports the finding that what DeBerry did to Jo.J. was grounds for discharge without the opportunity for remediation.

¶ 44    DeBerry next argues that the Board's finding that she removed M.M. from the classroom in a manner that was irremediable when struck him with a ruler was against the manifest weight

of the evidence. She points out that M.M. was not available to testify and argues that the only witness' recollection had to be refreshed by referring to a statement that he (J.W.) wrote a week after the incident, there was no explanation for the delay, and there were multiple dates on M.M.'s written statement. She also points out that J.W. did not speak to the amount of force that DeBerry used in order to "coax" M.M. from the classroom and into the hallway. She contends that she was just doing her job by removing a disruptive student from her classroom so that others could learn. She adds that even if she was "a little rough because the child in question was throwing a tantrum, then the incident should not be considered irremediable."

¶ 45    Regardless of whether M.M. was available to testify, J.W. testified and his written statement was contemporaneous and indicated that DeBerry hit both J.W. and M.M. with the "meterstick" that day. The three dates on the students' statements are indicative of nothing unusual. Those dates merely suggest that an investigation was in process and that the students were completing their statements shortly after an accusation was made. They were asked to write their accounts within just days of the incident, which was timely. Shabazz specified that the students wrote their statements independently.

¶ 46    The hearing officer determined that there was no evidence that DeBerry's initial handling of M.M. (sending him to stand in another part of the classroom, telling him to go the hallway, and asking J.W. to get the other teacher) was misconduct. However, the hearing officer reasoned that DeBerry's subsequent conduct with M.M. was misconduct. Even though DeBerry was the only one to specifically testify about "coaxing" and "guiding" M.M. from the classroom, she admitted to moving him by the hand while he was being belligerent and physically resisting her and she was holding the ruler in her other hand. J.W. and Brown also testified about how M.M. was acting.

J.W. also said that DeBerry struck M.M. with the ruler on other occasions and that she struck both J.W. and M.M. that day with the ruler once they were in the hallway. The injury to J.W.'s forehead was documented in his mother's photographs. DeBerry's contrary testimony was not believable, because the hearing officer found that what DeBerry did "was far more forceful" than simply holding M.M. by the hand and that she had hit him with the ruler, which were unacceptable acts of violence and *per se* irremediable. The manifest weight of the evidence does not indicate the findings of fact were in error.

¶ 47　Because M.M. was not available to testify at the hearing, DeBerry relies on *Kimble v. Illinois State Board of Education*, 2014 IL App (1st) 123436, ¶ 84, for the court's statement that "it is simply unjust to terminate a tenured teacher's employment without giving her the opportunity to cross-examine her accuser, and we cannot find that such a procedure comports with due process." DeBerry misconstrues *Kimble*'s significance. In that case, a teacher was dismissed based on allegations that she pushed and choked a student. *Id*. at ¶ 1. The student did not testify, there were no eyewitnesses, and the Board expressly made its termination decision entirely on hearsay testimony from the school's counselor, school's principal, and Board's investigator. *Kimble*, 2014 IL App (1st) 123436, ¶ 11. The teacher's "right to due process was violated where she did not have the opportunity to cross-examine a witness whose testimony was indispensable to the outcome of a hearing in which her constitutionally protected interest in continued employment was at stake." *Kimble*, 2014 IL App (1st) 123436, ¶ 82. Thus, *Kimble* holds that the exclusive use of hearsay to support dismissal violates due process. But that is not what happened here. Although M.M. did not testify about being struck with the ruler, J.W., who had witnessed M.M. being struck and was also struck in the process, did testify and was cross-examined by DeBerry.

¶ 48    DeBerry next argues that "taken by itself," the incident with J.W. and M.M. in 2018 was not "egregious" and that the Board's adverse ruling was contrary to the manifest weight of the evidence. She contends that M.M. was "behaving wildly, trying to remove himself from DeBerry's grasp [and] run away" and that it was his "wild motions [that] caused the approximately 20" ruler she was still holding from the class activity [of completing Venn diagrams] to connect with J.W.'s forehead while DeBerry was focusing on maintaining control." Also, she was not intending to strike M.M. and her contact with J.W.'s forehead was just an "unintentional consequence of M.M.'s erratic movements." She also contends that the ruler strike did not cause J.W. any "significant issues or damage" and that the "mere holding [of] a ruler in such a situation" was not negligent, immoral, or cruel. She also tries to cast doubt on J.W.'s credibility by pointing out Shabazz's testimony that when J.W. spoke to Shabazz about the incident, he "was concerned about Ms. DeBerry and getting her in trouble." DeBerry suggests that "the adults did not believe J.W.'s initial statements and likely influenced him to adopt their narrative."

¶ 49    J.W.'s initial reluctance to talk about what happened was explained because of his concern that DeBerry would get in trouble for hitting him with the ruler. If anything, this supports J.W.'s credibility, as he did not seem to have any animus against DeBerry. Furthermore, according to the manifest weight of the evidence, DeBerry was not merely "holding" a ruler that two students inadvertently ran into. Shabazz discredited DeBerry's testimony that she was using the ruler during a lesson about Venn diagrams and still had the ruler in her hand when M.M. became disruptive and she asked J.W. to get Brown from across the hall. There was also J.W.'s testimony that DeBerry swung the ruler with the intention of hitting M.M. with it, unintentionally hit J.W. on the forehead on the backswing, which left J.W. in pain and with visible marks. She then carried

through on her intent to strike M.M.

¶ 50    J.W.'s recollection was supported by his mother's testimony that he came home crying in pain, with swelling and blood on his forehead; the photographs that she took of his injury; and that she gave him ibuprofen the day he was injured and took him to his pediatrician a few days later. Brown's e-mail and testimony confirmed that DeBerry was holding a ruler in the hallway, although he said that he arrived after the incident and did not see DeBerry strike either student with the ruler. Shabazz, J.W., his mother, and the photographs were more credible to the Board than DeBerry's denial; her attempt to minimize and recharacterize the incident as accidental or "a misunderstanding perpetrated by the Principal;" or Brown's testimony that he was a mandated reporter and had no reason to report DeBerry. The hearing officer found that DeBerry struck J.W. with the ruler and this was *per se* irremediable conduct, regardless of her intent. DeBerry has not established that this finding of the Board was against the manifest weight.

¶ 51    Although she argues her conduct was remediable, as she did not intentionally strike J.W. and he did not suffer "significant" harm, the text of the statute is clear. Conduct is irremediable if it is "cruel, immoral, negligent, or criminal or [it] in any way causes psychological or physical harm or injury to a student." 105 ILCS 5/34-85(a) (West 2018). The law does not include a mental state or requirement of intent, and it expressly encompasses negligence. A basic principle of statutory interpretation is that the law's plain language is the best indication of the legislature's intent. *Village of Roselle*, 382 Ill. App. 3d at 1080. In our opinion, if the legislature intended to include the limitations that DeBerry reads into the statute, then the legislature would have provided for those limitations. Furthermore, *James*, 2015 IL App (1st) 141481, is instructive as to whether mental state or intent should have been part of the Board's analysis. *James* involved the teacher

who pretended to throw a stapler at a disruptive student, but part of it detached, flew across the room and struck another student who then had to have medical care. *James*, 2015 IL App (1st) 141481, ¶¶ 2, 14. Although the teacher did not intend to release the object or injure the second student, the Board held that his conduct was negligent and *per se* irremediable, and the appellate court upheld his termination. *James*, 2015 IL App (1st) 141481, ¶¶ 14, 21. *James* demonstrates that DeBerry's lack of intent to strike or harm J.W. does not absolve her of responsibility for her actions. The hearing officer found her conduct irremediable, regardless of whether it was viewed as intentionally striking M.M. (with intent imputed to striking J.W.) or negligently causing injury to J.W. The statute does not require that there be any "significant" injury or harm from DeBerry's actions.

¶ 52    She cites *Prato v. Vallas*, 331 Ill. App. 3d 852, 862 (2002), for the court's statement, "For conduct to be considered irremediable, the damage caused by that conduct must have been 'significant.' " This term can be traced from the *Prato* decision to *Board of Education v. Illinois State Board of Education*, 160 Ill. App. 3d 769, 776 (1987), and then to *Board of Education of School District No. 131, Kane County v. State Board of Education*, 99 Ill. 2d 111, 119 (1983). In the earliest case, a fourth-grade teacher was forcing students to behave or sit in their desks and was scratching and bruising them, but the court deemed the teacher's misconduct to be remediable because "[n]one of the students missed school or sought medical attention after contact with [the teacher]." *Id.* at 119. DeBerry cannot seriously contend that in 2018 it was appropriate for her to hit a student. DeBerry's misconduct was *per se* irremediable under a statute which encompasses action that "*in any way* causes psychological or physical harm or injury to a student." (Emphasis added.) 105 ILCS 5/34-85(a) (West 2018).

¶ 53    DeBerry contends that the hearing officer incorrectly deemed the injury to J.W.'s forehead to be apparent and that DeBerry had failed to provide proper medical attention. J.W. testified that after DeBerry struck him with the ruler, she sent him to the bathroom to put cold water on his head. His mother, Ms. W., testified that DeBerry called her and told her that J.W. had been accidentally hit while helping her. Ms. W. further testified that once she saw the injury with her own eyes, she immediately contacted the school and the "downtown" CPS office, took pictures of the injury, and gave him ibuprofen. She said she was "furious" about the incident and tried unsuccessfully to move her son out of DeBerry's classroom. Shabazz testified that Ms. W. was "livid" about the incident, in part because DeBerry had not conveyed the severity of the injury during their phone call. Shabazz further testified that DeBerry could have asked the physical education teacher or main office clerks, who could perform first aid, to examine J.W., even if the school nurse was not present that day. Finally, DeBerry did not report the incident to Shabazz or any other administrator, so Shabazz first heard of it from his assistant principal, who had been called by the central office after Ms. W. called them.

¶ 54    The hearing officer found that DeBerry's failure to report the incident, failure to seek proper care for J.W., and attempts to hide or downplay were irremediable. DeBerry has not shown that this finding was in error. Her abusive conduct harmed J.W. and there is no basis for concluding that it could have been remediated with a warning. Furthermore, as the hearing officer found, "there is no role for intentionally misleading a parent regarding an injury."

¶ 55    DeBerry argues that his injury was so minor that it did not require medical attention. This argument is refuted by J.W. and Ms. W.'s testimony and the photos of his forehead. J.W. was indeed injured. His injury may not have warranted emergency or urgent medical care, but Ms. W.

did give him over-the-counter medication that afternoon and took him to the pediatrician later in the week because he complained about a headache. The hearing officer heard DeBerry's version of events and rejected it. The hearing officer's role was to hear testimony, determine witness credibility and the weight to be given to their statements, and draw reasonable inferences from all the evidence. *Ahmad*, 365 Ill. App. 3d at 162. We will not overturn a factual finding unless the opposite conclusion is "clearly evident." *Id*. DeBerry has not met this standard.

¶ 56    DeBerry next addresses the 2015 incident with Ja.J. that was caught on the hallway's security video. DeBerry argues that this incident was arbitrarily included and prejudicial. An error in an evidentiary ruling will not lead to reversal unless the error was substantially prejudicial and affected the outcome. *Stapleton* ex rel. *Clark v. Moore*, 403 Ill. App. 3d 147, 156 (2010).

¶ 57    Examination of both the hearing officer's recommendation and the Board's decision shows that the inclusion of the 2015 incident (when Ja.J. was supposedly being "dramatic" and "threw herself to the wall" rather than being shoved into it by DeBerry) was not substantially prejudicial and did not affect the outcome of the proceedings. The hearing officer specified "[t]he Board has offered no convincing evidence to account for a delay of more than four years before bringing charges despite having video evidence." The hearing officer went on to note that timely pursuit of such matters is important due to potential issues with witness availability and recall. Due to the Board's failure to address the 2015 incident in a timely manner, the hearing officer determined that the 2015 incident would not be considered in his recommendation. The Board subsequently acknowledged that there was no explanation for "why the CEO did not seek dismissal at that time and the failure to act raises administrative and operational questions." The Board went on to specify, "But the 2015 incident does not stand alone. The other incidents of irremediable

misconduct proven at the hearing from 2017 and 2018 justify DeBerry's dismissal, so any [argument] relating to 2015 is not outcome-determinative."

¶ 58 Since both the hearing officer and Board acknowledged the issue that DeBerry is now addressing, and, therefore, disregarded the 2015 evidence, DeBerry has not shown that she was prejudiced by its presentation. With or without the evidence about Ja.J. and the wall in 2015, DeBerry has not presented any convincing argument that her dismissal on the basis of her misconduct during the 2017-18 school year was erroneous.

¶ 59 DeBerry next argues that the charges were Principal Shabazz's retaliation for her protected union activities in 2017 and that he had to influence students to make false accusations.

¶ 60 DeBerry, however, previously filed an unfair labor practice charge against the Board utilizing the same set of facts; the Illinois Educational Labor Relations Board ("IELRB") dismissed her charge because she failed to prove causation; and this court affirmed the IELRB's dismissal. See *DeBerry v Illinois Educational Labor Relations Board*, 2021 IL App (1st) 201127-U ("DeBerry filed an unfair labor practice charge claiming that Wadsworth's principal coerced students to fabricate allegations [about an incident involving DeBerry, a ruler, M.M. and J.W.] to harass her into leaving the school after she filed several grievances."). The doctrine of *res judicata* precludes DeBerry's relitigation of claims or issues previously decided. *Bagnola v. SmithKline Beecham Clinical Laboratories*, 333 Ill. App. 3d 711, 717 (2002). As the hearing officer found, that prior proceeding bars DeBerry from pursuing it yet again in this proceeding.

¶ 61 Finally, DeBerry argues that the hearing officer was biased and his lack of impartiality violated her right to due process. See *Girot v. Keith*, 212 Ill. 2d 372, 380 (2004) (whether the proceedings are judicial or administrative, parties are guaranteed the right to a fair and impartial

tribunal). "[T]he rigidity of the requirement that the trier be impartial and unconcerned in the result applies more strictly to an administrative adjudication where many of the safeguards which have been thrown around court proceedings have, in the interest of expedition and a supposed administrative efficiency been relaxed." *National Labor Relations Board v. Phelps*, 136 F.2d 562, 563 (5th Cir. 1943). Administrative hearing officers are "presumed to be objective" (*Alan Josephsen Co. v. Village of Mundelein*, 2024 IL App (1st) 230641, ¶ 20), and a "mere possibility of prejudice" is insufficient to show bias (*Williams v. Department of Employment Security*, 2016 IL App (1st) 142376, ¶ 46). DeBerry bears the burden of presenting evidence of prejudicial hearing conduct coupled with either personal bias stemming from an outside source (which she is not arguing) or stemming from facts adduced or events that occurred during the hearing itself. *Eychaner v. Gross*, 202 Ill. 2d 228, 280-281 (2002) (citing *Liteky v. United States*, 510 U.S. 540, 555 (1994)). A hearing officer's "rulings alone almost never constitute a valid basis for a claim of judicial bias or partiality." *Eychaner*, 202 Ill. 2d at 280.

> " '[O]pinions formed by the [hearing officer] on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion *unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible*. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.' " (Emphasis added.) *Eychaner*, 202 Ill. 2d at 281 (quoting *Liteky*, 510 U.S. at 555).

¶ 62 All of the examples that DeBerry cites of "biased" behavior merely take issue with evidentiary rulings and hearing management, and she also fails to cite factually-analogous

precedent indicating error. She argues that the hearing officer allowed questions that went "well beyond the scope of the specifications and charges" and overruled her valid objections. Despite arguing that this occurred "continually," she cites only one portion of the hearing. When the Board asked J.W. how many times DeBerry struck M.M., J.W. responded, "Well, that day," suggesting that this was not the first instance that DeBerry struck M.M. There were two follow-up questions. First, the Board asked whether J.W. saw DeBerry hit M.M. "at another time," and J.W. answered "Yes." Second, the Board asked how often DeBerry hit M.M., and J.W. answered that he did not know how often, but that "she usually hit him when he was doing something wrong." The hearing officer overruled DeBerry's objections to these two follow-ups. The Board next asked J.W. where DeBerry would hit M.M., and J.W. responded that DeBerry would strike M.M. on his back. At this point, the hearing officer instructed the Board to focus its questions on "the day of the occurrence," and the Board complied. This passage does not demonstrate bias.

¶ 63      DeBerry adds that it was then apparent that she would continue to object, so the hearing officer resorted to questioning J.W. himself. We disagree with DeBerry, because the hearing officer only asked three minimal and clarifying questions, specifically, could J.W. point to where he had been struck, was he pointing above right eyebrow, and did the blow leave a mark. These questions were neutral, rather than a display of deep-seated favoritism or antagonism that would make fair judgment impossible, and they efficiently concluded the line of questioning. DeBerry has not overcome the presumption of objectivity. DeBerry cites other passages that are similarly neutral and do not warrant discussion.

¶ 64      Under the provisions of section 34-85, DeBerry's conduct is deemed *per se* irremediable and she was not entitled to a written warning prior to her dismissal. Based on all of the above, we

find that the Board's ultimate decision to dismiss DeBerry without a written warning is not clearly erroneous under the specific facts of this case. Accordingly, we confirm the decision of the Board.

¶ 65    Confirmed.